# Report by CAPT Richard M. Kenin, USCG (ret.)
## *Godwin v. Royal Caribbean Cruise Line*

References
>  (a) Seacare Medical Charts for Mary Godwin aboard C/S BRILLIANCE OF THE SEAS dtd Dec 15 – Dec 18, 2018
>  (b) C/S BRILLIANCE OF THE SEAS ship's logs dtd Dec 15 2018
>  (c) US Coast Guard Aeromedical Technical Bulletin dtd June 2010

Experience: As a retired Captain in the U.S. Coast Guard I have has over 30 years of active duty experience as a maritime response practitioner, coordinator, and leader. Having piloted over 5000 hours in rescue helicopters and fixed-wing aircraft, I have participated in hundreds of search and rescue missions, including medical evacuations from vessels and land. I completed formal training in search and rescue (SAR) planning including the Search and Rescue Supervisors' course taught at the National SAR School in Yorktown, VA. In addition to flying Coast Guard rescue aircraft in the Caribbean, Gulf of Mexico and Northwest Pacific, I have commanded two Coast Guard air stations where I managed SAR activities over large areas of responsibility. While commanding Air Station Miami, FL, I initiated a highly successful medical evacuation (medevac) training program with Royal Caribbean Cruise Lines, whereby shipboard medical personnel were taught helicopter medevac policies, procedures, requirements and limitations. This training program has now been accepted industry-wide and continues as a model for government-industry cooperation to benefit the cruising public. In my final Coast Guard assignment, I served as Chief of Staff of the Seventh Coast Guard District where I oversaw the most active SAR region in the world, completing over 4000 cases, including an average 80 cruise ship medevacs per year.

Qualification:
I am qualified to provide an informed opinion on the facts of the case based on my extensive experience in the field of helicopter emergency response and maritime search and rescue management.

Opinion:
I was asked to examine a potential medical evacuation scenario involving the BRILLIANCE OF THE SEAS on December 16, 2018. This scenario was based on the ship's location starting at approximately 12:15am, the point at which the ship's medical team first encountered Ms. Godwin in her cabin. Based on the information I have reviewed, the applicable Coast Guard guidance, and my personal experience, I calculate that almost six hours would have transpired in any attempt to medically evacuate Ms. Godwin and deliver her to a comprehensive stroke treatment facility. According to the guidelines established by the Coast Guard's Chief Flight Surgeon in the Aeromedical Technical Bulletin, this would have exceeded the period of time to effect a positive outcome for Ms. Godwin's medical condition and therefore would have been determine to be not medically necessary. Further, the risks associated with a complex, multi-aircraft, early morning, open-ocean medevac for a patient's

1

condition beyond the limits of published guidance, would have precluded the operational commander from initiating such an attempt. In this circumstance, the BRILLIANCE OF THE SEAS took the proper action in continuing to the next port of call with Ms. Godwin under the continuous medical care of a physician. I base this opinion on the facts and analysis that follow.

Medevac Decision Criteria

Coast Guard policy requires that before a medevac mission may be initiated, the mission must be determined to be medically necessary and operationally feasible. Medical necessity is determined by Coast Guard policy and a military flight surgeon who evaluates the condition of the patient based upon information provided from the attending medical caregiver. Operational feasibility is determined by the SAR Mission Commander (SMC), in consultation with the rescue vehicle's Pilot in Command (PIC), Commanding Officer or coxswain.

Operational Feasibility

Operational feasibility includes the ability of the rescue asset (the helicopter, cutter, or small boat) to safely transit to the medevac location, retrieve the patient, provide proper medical care for the patient, and safely transit to a medical facility with a higher level of care than that provided at the patient's location of injury or illness.

Medical Necessity

Although actual medical necessity is determined by a military flight surgeon, an initial determination can be made based on the patient's vital signs and current condition. A patient who is not in a stable condition and/or risks a downturn in condition will typically not be removed from qualified medical care to affect a transport. Coast Guard vessels, and in particular aircraft, are not configured nor equipped to provide care needed by an unstable patient.

Additionally, an initial medical necessity determination can be made when a medical diagnosis is provided and Coast Guard policy dictates certain actions. For example, Coast Guard policy states that if a patient has progressed more than three hours since the onset of stroke symptoms, medical evacuation is not recommended due to the inherent risks and unlikely positive outcome of medical treatment.

The rescue agency's responsibility (as required by the International Search and Rescue Manual) is to deliver a medevac patient to adequate and appropriate medical care at the lowest risk to the patient and rescue crew.

In evaluating the request for medical evacuation of the patient in this case, the U.S. Coast Guard Rescue Coordination Center would have determined the location of the BRILLIANCE OF THE SEAS and weighed the risks in various options for medical evacuation, including the time criticality of the patient's condition.

2

Location

Had a medevac decision been considered after midnight on December 16th, 2018, the BRILLIANCE OF THE SEAS was located within the Seventh Coast Guard District's rescue coordination region, headquartered in Miami, FL.  However the ship was in the eastern Gulf of Mexico and the closest medevac helicopter would have been located in Clearwater, Florida, more than 150 nautical miles away.  Additionally, a nighttime medical evacuation, far offshore, involves a significant level of risk for the crew and aircraft.

Medical Evacuation Process

Rescue Coordination Center Miami would have evaluated the following two options:

1) Remove the patient by helicopter and return to medical care at the closest comprehensive stroke treatment center.  This option would involve diverting the BRILLIANCE OF THE SEAS toward Tampa, launching an MH-60T Medium Range Rescue helicopter from Clearwater, FL, flying out to rendezvous with the BRILLIANCE OF THE SEAS, hoisting the patient and medical team into the helicopter, and returning to medical care in Tampa or Naples, FL.  Because of the distance and complexity of this mission, this process would have taken nearly six hours from the time the patient was evaluated on the ship until delivery to a comprehensive stroke center for treatment.

Risk Factors:
a) This hoist evolution would occur in the early morning hours more than 110 miles from the closest point of land.  This would be a hazardous operation requiring planning for contingencies such as diverting around bad weather, problems during the hoist, or delays with the patient.
b) By policy, Coast Guard helicopters flying more than 50 miles from the nearest land require another aircraft to escort them on such long flights.  Because direct radio communication from shore to the rescue helicopter is limited by distance and the curvature of the earth, the escorting fixed-wing airplane would remain at high altitude to relay messages from the operational commander to the helicopter.  This escort airplane would also serve as a rescue aircraft if the helicopter had an emergency over the open ocean and was forced to ditch.
c) Coast Guard aircraft are not equipped or staffed as air ambulances. They typically carry medical oxygen, but no medications or health monitoring equipment. If the patient's condition worsened during the long helicopter flight back to shore, there would be minimal medical care available to treat the patient in the helicopter.

3

d) Coast Guard policy dictates a maximum medevac time of three hours from the onset of stroke symptoms until reaching a comprehensive stroke treatment center.  Beyond the three-hour limit, medevac is not considered medically necessary.  This hypothetical medevac would have resulted in the patient reaching a hospital after nearly twice the allowable elapsed time.

2) Continue with the patient under a physician's care on board the BRILLIANCE OF THE SEAS to the ship's next scheduled port of call in Grand Cayman where higher-level medical care or air ambulance transportation could be provided.

Summary

In this case, as described by the facts above, the risks identified would have made this a hazardous helicopter medevac mission and these risks clearly outweighed potential benefit to a patient already under a qualified physician's care.  If I were the helicopter Pilot in Command assigned for this mission, I would not have accepted this medevac mission because it violates Coast Guard policy guidance.  Similarly, if I had been the Search and Rescue Mission Commander in this hypothetical situation, I would not direct the launch of a helicopter to attempt this medical evacuation.

_____     2/21/21
CAPT Richard M. Kenin, USCG (retired)     Date

4

# Richard M. (Rick) Kenin

97 Strawberry Hill Road, Acton, MA 01720
Phone: 305.389.3667 • Email rick@keninfamily.com

EDUCATION / CERTIFICATION

1984 – United States Coast Guard Academy
- Bachelor of Science, Majoring in Marine Engineering and Naval Architecture

1999 – John F. Kennedy School of Government, Harvard University
- Master of Public Administration

2006 – National War College, National Defense University
- Master of Science, National Security and Strategic Studies

1989 - Federal Aviation Administration
- Airline Transport Pilot multi-engine airplane, Commercial/Instrument Pilot helicopter

PROFESSIONAL EXPERIENCE

March 2018 - Present
New England Life Flight d/b/a Boston MedFlight
*Chief Operating Officer*
- Executive management of aviation and ground (ambulance) critical care medical transportation company operating helicopters, fixed wing aircraft, and ground ambulances from four bases across Eastern Massachusetts, employing 160 aviation and healthcare professionals to safely complete 4300 patient transports annually.

July 2014 – March 2018
New England Life Flight d/b/a Boston MedFlight
*General Manager for Aviation Operations*
- Management oversight for aviation department of regional critical care medical transport company. Major projects include: completing FAA certification to become an independent air carrier, planning for future corporate facilities and bases.

July 2011 – July 2014
United States Coast Guard, Seventh District, Miami FL
*Chief of Staff*
- Oversee a command staff of 180 employees directing operations and support for the largest and busiest District in the Coast Guard comprising over 4000 active-duty members across the southeastern US, Puerto Rico and the US Virgin Island. Responsible for all aspects of strategic planning, regulatory compliance, financial accountability, operational efficiency and international diplomacy to manage current and future operations.

July 2008 – July 2011
United States Coast Guard Air Station Miami, FL
*Commanding Officer*
- Ultimate responsibility to train, equip, and direct 420 Coast Guard active duty members operating 11 helicopters and airplanes to carry out over 600 lifesaving flights, counter-drug smuggling / counter migrant smuggling operations annually, and environmental protection missions across Florida and the entire Caribbean Basin. Managed all aspects of construction, maintenance, and upkeep for a 25-acre military aviation base comprised of two large aircraft hangars, various support and administrative buildings.

May 2006 – June 2008
United States Coast Guard Headquarters, Washington, DC
*Executive Assistant to the Deputy Commandant for Operations*
- Manage Headquarters staff of 800 military and civilian employees providing policy direction and operating guidance for the entire service.  Carried out the most comprehensive reorganization of the Coast Guard's headquarters since World War II.

July 2003 - June 2005
United States Coast Guard, Air Station Houston, Clear Lake, Texas
*Commanding Officer*
- Led 110-person military unit protecting the Nation's foremost petrochemical port and offshore oil rig complex.  Flew as helicopter pilot-in-command and managed employment of six helicopters to provide search and rescue and homeland security for the Texas Gulf Coast.  Provided airborne security for the President of the United States.

May 2001 to June 2003
United States Coast Guard, Group/Air Station North Bend, Oregon
*Executive Officer*
- Flew as helicopter Pilot in Command while serving as chief administrative officer/second in command of major Coast Guard unit (400-members) comprised of 8 sub-units.  Responsible for construction contracting and maintenance of all facilities.

June 1999 to May 2001
United States Senate, Washington, DC
*Coast Guard Fellow, US Senate Committee on Commerce, Science and Transportation*
- Policy advisor to Senators McCain and Snowe on issues related to Coast Guard, Oceans and Fisheries policy.  Drafted, negotiated and passed the Maritime Transportation Security Act to address homeland security gaps after the 9-11 attacks.

Various operational assignments as a Commissioned Officer in the United States Coast Guard

PROFESSIONAL MEMBERSHIPS
Chairman, Helicopter Association International (HAI), Safety Working Group
Member, Commission on Accreditation of Medical Transport Systems, Standards Committee
Member, Air Medical Operators Association (AMOA), Safety Committee
Board Member, New England Helicopter Council
Member, U.S. Helicopter Safety Team, Helicopter Infrastructure subcommittee
Graduate, U.S. Navy Aviation Safety School
Military Instructor Pilot
Ancient Order of the Pterodactyls – Coast Guard Aviation Association

*Disclosure Statement available on request*