EXHIBIT B

Kenneth R. Harman M.D. CAPT(ret) USCG/USPHS                                    03/18/2021
P.O. Box 935, Orange Beach, AL 36561
251-622-1156
tychos@aol.com

### I.      INTROUCTION:

I served as a U.S. Coast Guard (USCG) flight surgeon (FS) from 2002 until 2014.  My first assignment was as a junior operational FS stationed at USCG Base Kodiak, AK, 2002 through 2005.  My duties included standing watch as the District 17 (Alaska region and it's US territorial waters) duty FS.  I frequently participated in decision making for medical evacuation requests (MEDEVAC), mission planning for MEDEVACs, and routinely flew on MEDEVAC missions to provide victim stabilization prior to transport as well as patient care during transport.

From 2006 to 2008, I was stationed at USCG Air Station, Cape Cod, MA as the District 1 (New England) senior FS.  In addition to standing duty as the District 1 FS, I was also responsible for supervising the other USCG flight surgeons within the district.

In 2008, I assumed the duties of a newly created position at the USCG Aviation Training Center (ATC) in Mobile, AL; the USCG Aviation Medicine Standardization Officer (AMSO).  A key focus of my work was efforts to standardize policy and procedure for USCG MEDEVAC.  During this time, I also continued to stand watch as the duty flight surgeon for USCG Districts 7 (southeastern US) and District 8 (Louisiana, Texas).  I remained in this position until my retirement in 2014.

Along with developing MEDEVAC policy products, my team at ATC also created a two-week course for flight surgeons new to the USCG.  The course is given two times a year and since my retirement I have continued to assist with the training.

In 2018, I joined the USCG Auxiliary.  Since then, I have worked as a FS at several USCG Air Stations, and given MEDEVAC training to senior aviation leadership, USCG Command Centers, and provided consultative services on a variety of issues to the USCG Medical Command.  Most recently, I volunteered as a USCG Auxiliarist FS at USCG Base Kodiak, AK from February 22, 2020 to March 22, 2020.

### II.     DOCUMENTS REVIEWED:

In writing my opinion, I reviewed the following documents:

Plaintiff's Complaint

Plaintiff's ship medical records

Plaintiff's medical records Health City, Grand Cayman Islands

Plaintiff's medical records Union General Hospital

Plaintiff's medical records Jasper Neurology

Mary Godwin mini transcript

Dale Godwin mini transcript

Expert opinion of USCG Captain(ret) R. Kenin

Kenneth R. Harman M.D. CAPT(ret) USCG/USPHS                                    03/18/2021
P.O. Box 935, Orange Beach, AL 36561
251-622-1156
tychos@aol.com

### III.  CASE SUMMARY:

According to the plaintiff's testimony, Mrs. Godwin went to sleep sometime around 9:00 or 10:00 PM on the night of December 15, 2018.  At that time, she did not report any symptoms that might have suggested that she was having a stroke.  She awoke sometime around 11:30 PM and went to the bathroom, where she noted facial weakness, difficulty speaking, and an unsteady gait.  These symptoms are consistent with a stroke.  Her husband called the ship's 911 emergency number and according to the medical records, nurse Isabel Pont RN responded.  Nurse Pont noted in a 00:30 December 16, 2018 medical record entry that she responded to the 911 call at 00:13 December 16, 2018.

Based on this information, it is reasonable to assume that Mrs. Godwin experienced a stroke sometime between 9:00 PM and 12:00 PM on the night of December 15, 2018.

### IV.  SPECIFIC OPINIONS:

**IV.A. Opinion regarding Mrs. Godwin's clinical status at or a few hours before 12:00 AM, December 16, 2018.**

It is my opinion that Mrs. Godwin did suffer a stroke.  A National Institute of Health Stroke Severity (NIHSS) Score was not documented in the RCCL medical record, but in his deposition Dr. Blignaut stated it was three.  It is my opinion that her NIHSS score would have been no more than six.

**IV.B.  Stroke**

There are two types of stroke:

Ischemic stroke - loss of oxygen and nutrients to brain tissue due to a blockage in an artery.

Hemorrhagic stroke - the bursting of a blood vessel leading to pressure from escaped blood into the tissues and loss of blood flow downstream from the site of the rupture.

Ischemic stroke most often occurs when clotted blood blocks flow through a blood vessel in the brain and accounts for about 87% of all strokes. Hemorrhagic stroke is far less common than ischemic stroke and is usually catastrophic.

Ischemic strokes can be treated with medication that may dissolve some of the clot and restore blood flow to the brain.  Since brain tissue cannot survive very long without oxygen and nutrients, the clot dissolving treatment should be given within 3 hours of symptom onset.  In 2015, the American Heart Association published findings suggesting that there may be some very modest improvement in outcome if the time to treatment is expanded to 4.5 hours.  To date, the FDA has not approved use beyond three hours.

The greater the time between onset of symptoms and treatment, the smaller the gain in outcome improvement. Additionally, delaying administration of the clot dissolving medication increases the risk that the treatment will result in a hemorrhagic stroke because the ischemic tissue is weakened and cannot

Kenneth R. Harman M.D. CAPT(ret) USCG/USPHS                                03/18/2021
P.O. Box 935, Orange Beach, AL 36561
251-622-1156
tychos@aol.com

withstand the blood pressure once circulation is restored.  A lack of any outcome improvement and the increasing risk of transforming an ischemic stroke into a hemorrhagic stroke makes treatment with clot dissolving medication after 4.5 hours inappropriate.

Giving clot dissolving treatment to a patient experiencing a hemorrhagic stroke may cause increased bleeding and greatly exacerbate the condition.  It is therefore imperative that testing is performed to confirm the diagnosis of ischemic stroke before treatment is begun.  There are several methods for testing, but the most common form is by a computerized axial tomographic (CAT) scan of the head.  Admitting a patient to a hospital, completing a preliminary evaluation, ordering, scheduling and completing a CAT scan can take up to an hour in most healthcare facilities and longer in some.  This added time must be taken into consideration when calculating the time from onset to treatment and requires that a stroke patient arrive at a treatment center within two hours of symptom onset.

Thrombectomy is a relatively new interventional treatment for stroke and in some instances, benefit from this therapy has been shown to occur up to 16 hours from time of symptom onset.  The limited number of medical centers with this capability and the daunting exclusionary criteria currently make this care unusual.  Thrombectomy is not indicated for patients with a NIHSS score of 6 or less.

**IV.C. USCG MEDEVAC Policy and Procedure**

When a request for MEDEVAC assistance is received by the USCG, regional Command Center personnel assume responsibility for management.  These Command Center personnel perform two procedures.  First, they validate the mission (falls within the regional jurisdiction, consistent with USCG approved mission parameters, not a prank call, etc.).  Secondly, once the request has been fully vetted and a decision is made to respond, the Command Center tasks a USCG operational unit.

When vetting a MEDEVAC request, Command Center personnel complete a form known as the MEDEVAC Request Checklist.  Once completed, the regional duty FS is contacted, and the case presented to them.  The MEDEVAC checklist information is shared, and the Command Center personnel await a recommendation from the duty FS.

USCG Flight Surgeons routinely request a telephone conversation with the person(s) requesting the MEDEVAC.  In the case of a cruise ship, the duty FS would ask to speak directly with the ship's medical officer.  Once this discussion is complete, the FS may want to take time to review current literature pertaining to the diagnosis and/or contact a specialist to receive expert advice.  On occasion, I have asked the command center to establish a call between the potential accepting physician and me.  This is done to clarify what intervention(s) will be considered and any time critical elements.

USCG flight surgeons use a job aid to assist with making a MEDEVAC recommendation (see enclosure).This job aid sequentially sorts through five critical steps in the decision-making process:

What does the victim have?

What does the victim need?

How soon do they need it?

Where can they get it?

Can the treatment window of opportunity be met?

Kenneth R. Harman M.D. CAPT(ret) USCG/USPHS                                      03/18/2021
P.O. Box 935, Orange Beach, AL 36561
251-622-1156
tychos@aol.com

For a stroke victim, USCG flight surgeons first focus on the time critical element when asked to make a recommendation for or against a MEDEVAC.  Unless there are compelling or extenuating circumstances, a USCG flight surgeon will not recommend MEDEVAC for a stroke victim if care cannot be instituted within three hours of symptom onset.  This requires that the victim be delivered to the treatment hospital within two hours of symptom onset.  The second element is assessing eligibility for emergent treatment if the patient can be delivered within the window of opportunity.  If the patient is not a candidate for clot dissolving therapy or thrombectomy, then there is no gain in moving them regardless of time intervals.

Cruise ships have the personnel and equipment to competently provide supportive care to a stroke victim in the same manner they would receive care if they were transported to a shoreside healthcare facility and clot dissolving therapy or thrombectomy was not performed.

Aviation maritime operations, particularly those involving helicopters, are inherently dangerous.  The USCG has lost personnel and aircraft while prosecuting MEDEVAC missions.  If no gain can be identified from an aviation maritime mission, then all that remains is the risk.  USCG Command Center personnel, operational unit commanders, and USCG flight surgeons are acutely aware that a mission with no gain is a mission that should not be executed.

**IV.D.  Considerations specific to MEDEVAC for Mrs. Godwin on December 16, 2018.**

Based on the medical records, Mrs. Godwin began experiencing symptoms of a stroke on or before 12:00 AM, December 16, 2018.  Had the US Coast Guard been called after this time, the flight surgeon would have asked command center personnel if Mrs. Godwin could be delivered to a hospital capable of providing appropriate treatment by 02:00 AM December 16, 2018.  This would provide the receiving hospital the time needed to perform appropriate evaluation before treatment (the three-hour window).  The flight surgeon would have advised against MEDEVAC if the transfer time exceeded this three-hour window.

According to the expert opinion offered by CAPT (ret) Kenin, a MEDEVAC would have taken about six hours to complete, well beyond the window of opportunity.  Had the USCG been called and the duty FS been informed that the MEDEVAC would take about six hours, they would have recommended against a MEDEVAC and advised that Mrs. Godwin should shelter in place until the ship was docked.

Had the command center personnel stated that Mrs. Godwin could be delivered to a shore facility capable of clot dissolving therapy or thrombectomy by 02:00 AM December 16, 2018, the flight surgeon would have asked to speak with the accepting specialist.  Specifically, they would want to know if the specialist would treat Mrs. Godwin with clot dissolving therapy even though she had an NIHSS score less than six and a history of a dissecting aortic aneurysm.  As mentioned above, an exclusionary criterion for thrombectomy is an NIHSS score of six or less.  Had the specialist indicated that due to these circumstances, Mrs. Godwin would not be a candidate for either clot dissolving therapy or thrombectomy, the flight surgeon would have recommended against MEDEVAC even if the time to treatment was within limits.

**V.        Conclusion:**

Possessing knowledge, experience, and expertise in USCG MEDEVAC operations, it is my opinion that had the USCG been contacted with a request for transport of Mrs. Godwin at any time after 12:00 AM December 16, 2018, they would have declined to execute a MEDEVAC mission.  The USCG would have

Kenneth R. Harman M.D. CAPT(ret) USCG/USPHS                          03/18/2021
P.O. Box 935, Orange Beach, AL 36561
251-622-1156
tychos@aol.com

recommended that Mrs. Godwin remain in the ship's sickbay under the care of the ship's medical staff until the ship safely docked.

Kenneth R. Harman MD

PO Box 935       WP 251-622-1156
Orange Beach, AL      tychos@aol.com

**Kenneth R. Harman M.D., FS, CAPT (ret), USCG/USPHS**      C.V. March, 2021

**Work Experience**

**2014 to Present**
- USCG Auxiliarist, Flotilla 3-10, 8th Coastal Region
- Retired from the US Coast Guard June 2014.
- Stand volunteer duty as a Flight Surgeon at various USCG Air Stations
- Teach a biannual two-week aviation operational medicine course at USCG Aviation Training Center, Mobile, AL.
- Guest Lecturer
- Licensed physician, Alabama

**July 2008 – June 2014:  USCG Aviation Training Center Mobile, AL**
**USCG Aviation Medicine Standardization Officer**
- Develop, maintain and monitor Coast Guard wide standards for aviation medicine.
- Director and instructor for the USCG Flight Surgeon Transition Course.
- Member, Mishap Analysis Board for incident at USCG Station New Orleans, 2008.
- Member, Mishap Analysis Board for USCG C-130 and USMC AH-1 mid-air collision, 2009
- Districts 7 and 8 duty flight surgeon for medical evacuation missions.

**July 2006 – July 2008 USCG Air Station, Cape Cod, MA**
**Chief, Health Services Division**
- Administrative responsibility for all health care related issues for Air Station Cape Cod and regional Coast Guard facilities (19 units including Cutters and Small Boat Stations).
- Supervise one physician, two dentists, one pharmacist, two physician assistants and a division staff of 45.
- Medical Director, Massachusetts Military Reservation Emergency Medical Services.
- USCG District One subject matter expert for all aviation medicine and medical evacuation issues.
- Outpatient care including pediatrics, women's health, and vasectomy.
- 2008 Coast Guard Health Care Facility of the Year Award, USCG Commendation Medal
- Coast Guard Meritorious Team Commendation

**Aug 2005 - July 2006 USCG Training Center, Petaluma, CA**
**Senior Medical Officer**
- Comprehensive outpatient care provider
- Supervise two physicians, four mid-level providers
- Facilitate the clinical training at HS 'A' and IDHS 'C' school students.
- Support operational units (5) in AOR
- Medical Unit Leader, USCG Incident Command Post, hurricane Katrina, September, 2005.  *PHS Crisis Response Service Award, Armed Forces Service Award*
- Aviation Mishap Board member, USCG helicopter crash, February, 2006

**Aug 2002 – Aug 2005   USCG ISC, Kodiak, AK**
**Medical Officer – Flight Surgeon**
- Provide comprehensive outpatient care. *USCG Commendation Medal.*
- Flight Surgeon, USCG District-17 (Alaska Region).  Evaluate medical evacuation requests; make recommendations about appropriateness of mission and response time; provide on sight and transport medical care.  *Commander Elmer F. Stone Aviation Award.*

- Designated Medical Officer Advisor for eight AOR units.
- Deployed on the USNS Mercy during Tsunami relief to Indonesia (Feb-Mar 2005). Assigned duty as the Senior Ashore Medical Triage Officer. ***Navy Achievement Medal, US PHS Outstanding Unit Citation***

### 1991-2002 Oak Mountain Family Practice   Pelham , AL
### Private Practice

- Full spectrum family practice, including inpatient care, pediatrics, new born care, and minor surgery
- Active Medical Staff Member, Brookwood Medical Center 1991-02
- Chairman, Medical Records Committee, Brookwood Medical Center
- Member, Governing Board, Alabama Medical Group 1997-98
- Sub-section Chief, Family Practice, Brookwood Medical Center
- Clinical Investigator, Riverchase Research Inc. 1991-2002
- Clinical Preceptor, Department of Family and Community Medicine, Univ. of Alabama at Birmingham School of Medicine

### 1988-91 Univ. AL School of Medicine, Birmingham, AL
### Assistant Professor and Director of Residency Training, Department of Family and Community Medicine

- Duke Fellowship, Medical Education Leadership 1988
- Outstanding Departmental Faculty Award 1989
- Outstanding Faculty Award, Society of Teachers in Family Medicine

### 1988-95   United States Navy Reservist
### Department Head, Casualty Receiving, Fleet Hospital 11

- Desert Storm deployment, Jubail, Saudi Arabia: Casualty-receiving unit, fleet hospital 15, Jan-May, 1991.

### 1985-88 US Naval Hospital, Puerto Rico

- Department Head, Family Medicine
- Department Head, Ambulatory and Outpatient Care
- Department Head, Emergency Medical Services
- Chairman, Family Advocacy Committee

### 1980-83 US Naval Hospital,  Okinawa, Japan
### Physician in Charge, Emergency Medical Services

- Senior medical officer in charge of the hospital emergency room
- Operational Deployment USS Tarawa 1981
- Team Leader, Medical Support, Operation Team Spirit, Korea, 1982

**Education**

**2009 - Naval War College, Newport, R.I.**
- MA program National Security and Strategic Studies

**2007 – Homeland Security Medical Executive Course**
- University of South Florida

**2004 – Addiction Orientation for Health Care Providers**
- U.S. Naval Hospital, Camp Pendleton, CA

**2002 – US Army Academy of Health Sciences**
- Flight Surgeon Primary Course

**1988 – 1989 Duke University, Chapel Hill, NC**
- Family Practice Faculty Development Fellowship

**1983-85 - US Naval Hospital, Pensacola, FL**

Residency, Family Practice
- Tropical Medicine and Infectious Disease training, Panama City, Panama
- Combat Casualty Care Course, San Antonio TX

**1979-80 Univ. of TN School of Medicine, Memphis, TN**

Internship, Internal Medicine

**1975-79 Univ. AL School of Medicine, Birmingham, AL**

Medical Doctorate
- US Navy Health Professions Scholarship
- Senior Class Officer

**1970-75 - University of South Alabama,  Mobile, AL**

Bachelor of Science, Chemical Engineering
- Cooperative Education Student, Ciba-Geigy Chemical Corporation

**Certificates**
- Diplomat, National Board of Medical Examiners, 1980
- Diplomat, American Board of Family Practice, 1986,92,98,04
- Medical License, State of Alabama, 13984
- National Provider Identifier, 1326067380

**Military Awards**
- US Coast Guard Meritorious Service Medal
- US Coast Guard Commendation Medal (2)
- US Navy Achievement Medal
- US Coast Guard Presidential Unit Citation
- US PHS Outstanding Unit Citation
- US PHS Unit Commendation
- US Coast Guard Meritorious Unit Commendation (3)
- US PHS Hazardous Duty Award
- US PHS Foreign Service Award
- US PHS Isolated Hardship Award
- US PHS Crisis Response Service Award
- Commander Elmer F. Stone Aviation Award
- US National Defense Medal (2)

- US Navy Southwest Asia Expeditionary Force Medal
- US Coast Guard/US Navy Global War on Terrorism Service Medal
- US Navy Humanitarian Service Medal
- US Navy Overseas Service Ribbon with Silver Star

**Publications**

- ***Cold Water Immersion; A Case Study***

Military Medicine, March, 2005

- ***Coast Guard Response to Hurricane Katrina (interview)***

US Medicine, January 2006

- ***Coast Guard Aviation Medicine (interview)***

MD Net Guide, January 2007

- ***Going Aboard Ship***

Commissioned Officers Association Frontline, February 2007

**Presentations**

- ***USNS Mercy Response to the Indian Ocean Tsunami, 2005***
- ***Disaster Response:  A Comparison Between the Indian Ocean Tsunami and hurricane Katrina, 2005***
- ***Pandemic Influenza/ Avian Influenza***
- ***Anthrax Biological Threat and Immunization Strategies***
- ***Small Pox Biological Threat and Immunization Strategies***
- ***Aviation Spatial Disorientation***
- ***Aviation High Altitude Physiology***
- ***Industrial Noise and Hearing Conservation***
- ***Pregnancy in military aviation***
- ***Aeromedical Evacuation and Air Ambulance Operations***

**K Harman   - 4 -**