**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MARY GODWIN,                          )
                                      )
    Plaintiff,                        )
                                      )
VS.                                   ) CASE NO.:
                                      ) 1:19-cv-24672-JG
ROYAL CARIBBEAN CRUISE                )
LTD., a Liberian                      )
Corporation,                          )
                                      )
    Defendant.                        )

------------------------------------

ORAL DEPOSITION OF

KENNETH ALAN TOTZ, D.O.

MAY 17, 2021

------------------------------------

ORAL DEPOSITION OF KENNETH ALAN TOTZ, D.O.,
produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the
above-styled and numbered cause on May 17, 2021, from
9:52 a.m. to 1:10 p.m., before Annette Peltier, CSR,
Texas Certified Realtime Reporter, in and for the
State of Texas, reported by machine shorthand, at the
offices of Regus Business Center, 700 Milam, Suite
1300, Houston, Texas 77002, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on
the record or attached hereto.

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
MR. THOMAS D. GRAHAM
Leesfield Scolaro, P.A.
2350 S. Dixie Highway
Miami, Florida 33133
305.854.4900
Graham@leesfield.com

FOR THE DEFENDANT:
MR. MICHAEL DRAHOS
GrayRobinson, P.A.
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
561.268.5727
Michael.Drahos@gray-robinson.com

**Page 3**

Index

|  | Page |
|---|---|
| Appearances............................ | 2 |
| Examination by Mr. Drahos................ | 4 |
| Examination by Mr. Graham................ | 134 |
| Adjournment............................. | 148 |
| Errata Sheet............................ | 149 |
| Signature Page.......................... | 150 |
| Court Reporter's Certificate............ | 151 |

Exhibits

| Number | Description | Page |
|---|---|---|
| Exhibit A | Re-Notice of Taking Deposition Duces Tecum...... | 5 |
| Exhibit B | Dr. Totz Expert Witness Fee Schedule................ | 11 |
| Exhibit C | Dr. Totz Curriculum Vitae... | 32 |
| Exhibit D | Plaintiff's Rebuttal Expert Witness Disclosure And Report.................. | 148 |
| Exhibit E | (Retained by Counsel) Thumb Drive................. | 148 |

* * * * *

**Page 4**

KENNETH ALAN TOTZ, D.O., Having been first duly sworn, testified upon his oath as follows:

EXAMINATION

BY MR. DRAHOS:

Q.  Good morning.  Can you please state your name for the record.

A.  Kenneth Alan Totz.

Q.  And spell your last name for us.

A.  T-O-T-Z.

Q.  And, Dr. Totz, you've been produced here today as a rebuttal expert on behalf of the plaintiff in the Mary Godwin versus Royal Caribbean case; is that correct?

A.  That's correct.

Q.  And specifically, you appeared in response to a notice of taking deposition duces tecum, correct?

A.  Yes, sir.

Q.  Did you get a chance to review that duces tecum before appearing today?

A.  Yes, sir.

Q.  And in response to that duces tecum, did you bring all documents?

A.  I did.

MR. DRAHOS:  We're going to go ahead

**Page 5**

and mark that as Exhibit A to the deposition.

Tom, I'm going to pass those down to you as we go since we're so far away.

(Whereupon Exhibit Number A was marked for identification.)

MR. GRAHAM:  That's just the subpoena.

THE WITNESS:  Okay.

Q.  (BY MR. DRAHOS)  Doctor, is there anything that you've brought here today that was not identified in your expert report but that is responsive to the duces tecum?

A.  In reviewing my records, yes, there are several things, actually.

One is -- actually, you know, four things. I believe, there's two trial -- two medical trials: One's the ECASS trial and one's the WAKE UP trial that I utilized; and the other two are the -- the depositions of the -- Mrs. Godwin and Mr. Godwin.

Q.  When did you review the depositions of Mr. and Mrs. Godwin?

A.  As soon as I received them with my packet --

Q.  Which one --

A.  -- yeah, with my packet of items.  That would have been somewhere in the latter part of March.

Q.  Of 2020?

**Page 6**

A. 2021.

Q. So at the time you wrote your report, you had already reviewed Mrs. Godwin's deposition?

A. That's correct.

Q. Why is it not listed in your "documents reviewed" section?

A. It was accidentally omitted.

Q. Does the same hold true for Mr. Godwin, as well?

A. Correct.

Q. The medical trials you made mention of... you said the WAKE trial?

A. WAKE UP.

Q. What is that?

A. It is a -- a trial for thrombolytic therapy.

Q. Is that a peer-reviewed trial?

A. It's from New England Journal of Medicine; and I included it in that thumb drive, both that and the ECASS trial.

Q. And when you say -- can you say that slower?

A. Yeah. It's E-C-A-S-S, and I believe it's, dash, III, like the roman numeral III.

Q. And did you review both the WAKE UP trial and the ECASS-III trial in support of your expert rebuttal report?

**Page 7**

A. Yes, sir.

Q. Why are those not listed in your report?

A. I've -- again, I forgot to include those and noted them as I was reviewing.

Q. When did you come to the realization that you had forgot to mention them in your report?

A. It was approximately a week ago or so when I began preparing for the deposition.

Q. And so when you began preparing a week ago and realized that these two -- or actually, these four items were not listed, why not provide some sort of supplement or at least notice to me that you were going to rely upon two other trials that were not listed in your expert report?

MR. GRAHAM: Objection, form.

A. Those are included in your thumb drive, sir.

Q. (BY MR. DRAHOS) Understood, but I've received them literally a minute ago.

MR. GRAHAM: Objection.

Q. (BY MR. DRAHOS) So other than having you hand me the thumb drive approximately a minute before the deposition started, you would agree you took no effort to notify me that there were two different trials that you were going to be relying upon in support of your opinions in this case.

**Page 8**

MR. GRAHAM: Objection.

Q. (BY MR. DRAHOS) Agreed?

A. I did not provide them to you until today, sir.

Q. Anything else other than those four items?

A. Nothing that I recall, sir.

Q. So what did you do to prepare for today's deposition?

A. I read through my report. I read through all of the documents that I have on your thumb drive there, including all the trials.

Q. Anything else?

A. Nothing that I recall.

Q. And how many meetings, if any, have you had with plaintiff's counsel in advance of today's deposition?

A. Just today.

Q. How many times have you spoken to plaintiff's counsel in advance of today's deposition?

A. I believe twice.

Q. When was the first time?

A. Sometime around when I submitted the -- my report on or about April 2nd or so, letting him know that I sent it over to him; and the second, I believe, was trying to arrange deposition times, continuances.

Q. So is it your testimony here today under oath

**Page 9**

that you never spoke to plaintiff's counsel prior to submitting your report in this case?

A. Well, forgive me. Yes, he -- he called me and asked me if I would review the case and...

Q. When was that?

A. That was somewhere around the week of mid March, around March 15th of 2021; and again, that's -- that's not an exact date. That's an approximate date.

Q. How long was that phone call?

A. It was maybe five, ten minutes.

Q. Had you reviewed any information prior to the call?

A. He -- his secretary had sent me the complaint, and so I had an opportunity to review the complaint before I spoke with him.

Q. Anything else?

A. And that is it, I believe.

Q. And so during this five- to ten-minute phone call, what was discussed?

A. We -- we discussed the -- the -- what happened in -- in the case, and he let me know that his secretary was going to be sending over all of the medical records and documents associated with the case -- depositions, et cetera -- and asked me to review them and write a report based on my opinions.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    Pages 10..13

Page 10

Q.  And you did not speak to plaintiff's counsel again prior to submitting that report on April the 2nd?

A.  That's correct.

Q.  How many versions of this report exist?

A.  One.

Q.  You've made no changes or erratas to it at any point in time?

A.  I write it as I go along.

Q.  And you mentioned that you met with plaintiff's counsel today, as well?

A.  Yes, sir.

Q.  For how long?

A.  Approximately 45 minutes to an hour.

Q.  And so how much time have you spent in total preparing for today's deposition?

A.  Approximately 35 to 40 hours.

Q.  That's total time in the case?

A.  Yes, sir.

Q.  About how much time was spent specifically to prepare for today?  You had mentioned that you read your report --

A.  Sure.

Q.  -- and all documents on the thumb drive --

A.  Sure.

Page 11

Q.  -- and you met with plaintiff's counsel for 60 minutes.  So how much time in total?

A.  Approximately 12, 13 hours.

Q.  Preparing for today?

A.  Yes, sir.

Q.  And are you billing plaintiff for that time?

A.  Yes, sir.

Q.  And so if I understood your testimony correctly, then, up until the present moment you've spent a grand total of about 40 minutes in this case -- I'm sorry -- 40 hours in this case?

A.  Yes, sir.  That's an approximate, give or take a few hours.

Q.  And how much do you charge for your -- your time?

A.  $600 per hour to review these -- to review the cases, not -- that doesn't include deposition or trial time.

Q.  Okay.

MR. DRAHOS:  Let's mark your fee schedule as Exhibit B to the deposition.

(Whereupon Exhibit Number B was marked for identification.)

Q.  (BY MR. DRAHOS)  So you said that you charge $600 an hour for case review.

Page 12

Do you require a retainer?

A.  No, sir.

Q.  Have you generated any invoices for this case?

A.  Yes, sir.

Q.  Where are they?

A.  They're on the thumb drive.  It is on the thumb drive, should I say.

Q.  How many invoices have you generated in total?

A.  One, one for the -- one for the plaintiff and one for yourself.

Q.  And does the invoice for the plaintiff reflect all 40 hours spent on the case to date?

A.  No, sir.

Q.  How much time has been billed to the plaintiff thus far?

A.  Approximately 25 hours.

Q.  And so is what you're saying is there's another bill coming for 15 hours?

A.  Yes, sir.

Q.  And so if my math is correct -- and I'm going to check it on my calculator here -- you've got $24,000 into the case?

A.  If -- I -- I think that would be a -- a reasonable estimate, yes, sir.

Q.  All right.  40 hours times 600 --

Page 13

A.  Yes, sir.

Q.  -- 24,000?

A.  Yes, sir, right.

Q.  Okay.  And so your trial testimony is what?

A.  $6,000 for a half day, $8,000 for a full day.

Q.  Does that include travel time?

A.  No, sir.

Q.  How do you bill your travel?

A.  I bill it just as -- you know, I bill for the actual expenses; and then it's $5,000 per day for travel if I'm going to be outside of the Houston area.

Q.  So in this case, if the case were to go to trial -- and it's going to go to trial in Miami in federal court -- does that mean that you're going to be billing the plaintiff $13,000 to appear?

A.  Each day that I'm there -- I don't include the $5,000 with the trial.  So if I'm in trial, it would just be -- for a full day, it would be $8,000; it wouldn't be plus the $5,000.

So my initial day of traveling would be 5,000 if I'm not appearing in court that day.  If I'm leaving the next day and I'm not in court, then that would be an additional 5,000.

Q.  Okay.  So if you were to, let's say, fly in on a Wednesday --

Page 14

A. Uh-huh.

Q. -- it's $5,000; and you testify on Thursday, it's $8,000. And then you fly home on Friday, that's another 5,000?

A. Yes, sir, if it's a full day in court.

Q. Go ahead and just confirm that that is indeed your fee schedule there. We'll mark it as Exhibit B.

A. Yes, sir.

Q. Okay. So you've been very busy since I met you last.

Do you remember meeting me?

A. Yes, I do.

Q. I see here that since the time that I deposed you back in July of 2019, it looks to me like you've now testified -- or I should say you've served as an expert in 358 cases?

A. Close to that, yes, sir.

Q. And just according to my calculations and reviewing your testimony history, it looks to me like 236 cases in 2020 alone.

A. That would be a close estimate.

Q. And about 43 so far this year?

A. That would be a close estimate, yes, sir.

Q. And do you charge $600 an hour for each one of these cases?

Page 15

A. No, sir.

Q. What do you charge for these cases here where I see you're doing work as a medical billing expert?

A. And it's included on my -- on my fee schedule, here, sir.

So to review a billing only review, it's $750 if it's zero to 100 pages of documents to review. If it is a billing and medical necessity, it's $1,000 to review that case.

Q. What if there is 5,000 pages of medical records?

A. Then for each -- each page beyond 100 pages, it's $2 per additional page; and that's for a billing only review.

If it's a medical necessity review, it's beyond 300 pages, it's 200 -- or excuse me -- $2 per additional page.

Q. So these cases, a large majority of which you're serving as a -- what you call yourself, a defense expert to evaluate reasonableness of -- I assume "ED" means emergency room care?

A. Forgive me. Could you repeat that?

Q. Sure, yeah.

In this -- you refer to it throughout this as "reasonableness of ED care."

Page 16

A. Yes.

Q. I assume you're referring to the emergency room?

A. Emergency department, yes, sir.

Q. All right. So when you refer to yourself in this testimonial history as a defense expert witness to evaluate the reasonableness of emergency room care, medical billing, and medical necessity, you've been retained by the insurance company?

A. No, sir. Actually, I'm hired by a firm that is contacted by either insurance companies or law firms directly and --

Q. Okay.

A. -- and some of them -- some of them, I am contacted directly by the -- the defense law firm, but...

Q. And so what your role is, then, in these particular cases is to review the medical care that was rendered to the plaintiff and determine whether or not, first, that medical care was appropriate -- or I should say, what, reasonably necessary?

A. Medically necessary --

Q. Okay.

A. -- yeah.

Q. Medically necessary, and then whether or not

Page 17

the charges were appropriate?

A. Reasonable, yes, sir.

Q. All right. And so would you agree, then, that when you call yourself a defense expert, in actuality what you're doing is evaluating the merits of the hospital care -- strike that. Let me ask it again.

When you call yourself a defense expert, what you're being retained to do is potentially criticize the medical billing that's been rendered by the hospital; so your adverse to the medical care.

A. I'm analyzing the medical care that was delivered and whether the medical care was necessary based on the -- on the documentation in the medical record; and then the charges, I'm opining on whether the -- whether the charges are usual, customary, and reasonable.

Q. Okay. And so in those circumstances, though, you are adverse to the hospital and its medical staff?

A. I -- I'm not -- I'm not adverse to -- to either side. I'm just providing an opinion for the -- if the documentation in the medical record is -- supports the orders for the -- the services that were provided.

Q. Okay. So I've read a lot -- a lot of these affidavits that you put together. They are available, by the way; you can -- you can read them. Somebody

Page 18

like myself who wants to see what you're doing gets a good feel for it.

So it was my impression -- and correct me if I'm wrong -- that in every instance in which you were retained by the defense to review the reasonableness of medical billing, you entered an opinion that was critical of the billing?

MR. GRAHAM: Objection, form.

A. No, that's -- that's incorrect because the counter-affidavits that you are reviewing only identify those elements of the care that I was critical of. The care that I was not critical of is not included in those counter-affidavits.

Q. (BY MR. DRAHOS) I wasn't referring to counter-affidavits, so let me see if I can break it down a little bit more clearly.

In all of these instances when you've been identified by the defendant as an expert to determine the reasonableness of medical billing, you've entered an affidavit which indicates that the medical billing was unreasonable for any number of particular reasons, correct?

MR. GRAHAM: Object to form.

A. And again, forgive me, I'm just not clear what you're asking.

Page 19

Q. (BY MR. DRAHOS) Do you need me to put the CV there in front of you so you can look at it?

A. No.

Q. What I'm talking about is all these 300 and some odd cases where you attempt to portray yourself as a defense expert witness, you are not doing so in support of the medical care that was rendered; you would agree?

A. No, that's not -- that's not true.

If -- I'm providing an objective opinion on the care that was delivered. If the care was reasonable, it's reasonable. If the care was unreasonable or medically unnecessary based on the documentation in the medical record, then -- then it's so stated in the record. If the charges were reasonable, then they are -- are so stated; if they are unreasonable and outside of the usual, customary, and reasonable range of charges or reimbursement, it's -- it's so stated in the report.

Q. So in the 300 and some odd cases here that you've reviewed in this capacity, what percentage of the affidavits that you've prepared have been of the opinion that the medical billing was reasonably necessary?

A. In most -- in most of the cases, there are

Page 20

something that is either medically unnecessary or unreasonable, but there are a significant minority of the cases where the -- the care is just plain reasonable and the charges are -- are reasonable, as well.

Q. All right. So when you say "significant minority" --

A. Yeah.

Q. -- tell me, less than 10 percent?

A. I'd say 25 percent of the cases, at least, there are -- there are issues within the case where the care is either medically necessary or the -- and/or the charges are within the usual, customary, and reasonable range.

Q. Okay. So what about the instances where you've determined that the medical care is necessary but the charges are outside the reasonable range, what percentage of time would that account for?

A. Yeah, I'm not sure if I could break that down for you.

Q. Is that because it's 100 percent?

A. It -- that is clearly not the case.

Q. All right. So what you're telling us is that there is an affidavit out there that exists where you were retained by the defense and you answered an

Page 21

affidavit that said not only was the care medically necessary, but the billing was also appropriate?

MR. GRAHAM: Objection.

A. No, because if the care is medically necessary and the billing is usual, customary, and reasonable, I won't produce a counter-affidavit because there's nothing to counter.

Q. (BY MR. DRAHOS) Okay. So going back, then, to my original question, in each and every one of these instances you identified here, your opinion was either that the medical care was not medically necessary or that the billing was unreasonable; it was one of the two or perhaps both in some instances, correct?

A. And -- and forgive me. Could you repeat that again?

Q. Sure.

In the 300 and some odd cases that are identified in your testimonial history, your ultimate conclusion was that either the medical care was not medically necessary or that the billing was unreasonable or, in some instances, both?

A. So it should -- it should be clear, though, when -- medical necessity is not just a blanket statement over all of the care that was delivered during the patient encounter, so I break it down to

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    **Pages 22..25**

Page 22

each order; so whether it's a CAT scan of the head, a CAT scan of the neck, lab tests, ultrasounds -- so there could be a single element or a single charge that is medically unnecessary and the others are fine, and the same thing applies to the billing.

The billing -- one of the many labs or tests could be usual, customary, and reasonable or -- and some of the other ones may not.

Q.  I appreciate your explanation, but I would appreciate an answer to the question a lot more.

You would agree with me that in the 300 and some odd cases you've identified, your conclusion was ultimately that either the medical care was not necessary or that the billing was excessive or both instances, it was both unnecessary and excessive?

MR. GRAHAM:  Objection, form.

A.  And -- and I've stated that in the majority of the cases, there is at least a single element of the medical necessity and/or the billing that is unreasonable.

Q.  (BY MR. DRAHOS)  When you say "the majority of the cases," quantify for me what you mean by that.

A.  Greater than 75 percent.

Q.  So I just want to be sure, then:  What you're telling me is that there has been an instance where

Page 23

you have executed an affidavit and said, I've looked at this and I believe that the medical care was necessary and that the billing was reasonable?

A.  And I can't recall if there was a counter-affidavit -- well, actually, there wouldn't be a counter-affidavit -- that, again, has both billing and charge -- billing and medical necessity because it wouldn't make sense to provide a counter-affidavit in those instances.

Q.  Okay.

A.  But again, as I stated, that it -- it -- if you -- again, you have access to those, all of those counter-affidavits; and if there's a counter-affidavit out there, it signifies that there was at least one element of the medical necessity that was not necessary or the billing was unreasonable.

Q.  Okay.  And so to wrap this up, then, Doctor, what you're telling us is that in the testimonial history you've provided under the heading "Expert Witness Testimonies" -- and again, 300 and something of these -- every single one of them had to have been instances, then, where you executed an affidavit that either criticized the medical necessity of the care or the billing.

A.  Yeah, I think that would be an accurate

Page 24

statement.

Q.  Okay.  Thank you.

What do you do in arbitrations?

A.  I have not done any arbitrations.

Q.  So in -- on Page 27 of your CV, it lists "Mediations/Arbitrations"; and there's 40 -- 40 total instances.  What are these that you're referring to?

A.  Those are all mediations.

Q.  That you've attended in what capacity?

A.  As a mediator between insurance companies and providers for the State of Texas.

Q.  Okay.  And in all of these, they were billing balance disputes?

A.  Balance billing disputes, yes, sir.

Q.  Balance billing disputes?

A.  Yes, sir; also called surprise billing, commonly.

Q.  So in going through all these, I identified seven instances where you testified substantively on a particular aspect of a personal injury matter.

Does that sound about right?

A.  Somewhere thereabouts, yes, sir.

Q.  Okay.  So I wanted to ask you about the ones that I was able to identify.

Of course, Brenda Jackson versus Carnival

Page 25

was my case, correct?

A.  Yes, sir.

Q.  Right.

I noticed you listed in there, "case settled for plaintiff."

Where did you get that from?

A.  The plaintiff's attorney said to me.

Q.  Okay.  You may need to word that a little differently, sir.  That suggests a favorable settlement for the plaintiff, when I believe it wasn't; so I would appreciate it if you would change that to "case settled" because it was a confidential settlement.

MR. GRAHAM:  Objection, form.

Q.  (BY MR. DRAHOS)  What was the Stryker versus Middleton case?

A.  Forgive me.  I -- I -- I'm -- I -- I'm not recalling the contents of -- of that particular case.

Q.  And it says, "Plaintiff's expert witness in medical negligence personal injury action" in August of 2019.

A.  And -- and forgive me.  I -- I do not recall the specifics of that particular case.

Q.  Is that Stryker, like the medical supply company Stryker?

Page 26

A. Again, I -- I really don't recall the specifics of that case; however, I don't believe it was involving the medical device company.

Q. Did it --

A. It may have been somebody's last name.

Q. Did it involve stroke?

A. I -- no.

Q. What about the -- I'm sure I'm not going to say this correctly -- Broadnax versus Gilberto Tejeda, Marjorie Diaz, and Socorro Vega. You testified as a defense expert in Dallas County, Texas?

A. And again, forgive me. I -- I just don't recall the specifics of that.

Q. That was in October of 2020. You don't remember that case?

A. You see how many cases I've done, sir.

Q. What about Daniel Fossett, F-O-S-S-E-T-T, versus Owens Corning, personal injury claim?

A. Yes, sir. I -- I do recall that because I'm currently involved in that one.

Q. Okay. What is that case about?

A. And that -- and I'm not sure if I'm -- it -- really at liberty to -- to speak about it because the case is ongoing, and this may become a public record and --

Page 27

Q. Well, if the case is in litigation, it's a public record.

A. Yeah, yeah.

And I'm not sure if I'm comfortable speaking about that.

Q. Well, it's public record because it's actually -- there's a case number for it.

A. I understand, but my involvement with the defense is -- is confidential at this time, and I'm really not comfortable speaking about it.

Q. According to -- according to your CV, you have not testified in that case yet?

A. That is correct.

Q. How about Pamela Wilson versus Scott Nowlin, plaintiff's expert witness in a medical malpractice case.

A. Again, I don't recall the specifics of that one.

Q. What was the Jackson case about?

A. Heart attack.

Q. How is it that you remember that one but you can't remember these other ones?

MR. GRAHAM: Objection, form.

A. Well, there are some things about some that you don't; and if you would have liked me to review these

Page 28

cases ahead of time, I would have been happy to do that if you would have notified me.

Q. (BY MR. DRAHOS) How about Israel Yanez, Y-A-N-E-Z, versus State Farm Mutual Automobile Insurance Company?

A. I don't recall the specifics of that one.

Q. According to your CV, you testified three months ago in that case. You don't recall?

A. I just don't recall the specifics.

Q. And how about Axelrod, A-X-E-L-R-O-D, versus Bri Anna Kulik and Sean Tiffee, a deposition in February of 2021?

A. I don't recall the specifics of that case, either, sir.

Q. So it would seem to me that you don't recall the specifics of any instances in which you've testified as an expert except for Jackson versus Carnival.

A. Again, if you had asked me to prepare for those, I would have been happy to give you specifics on each of those cases.

Q. Did you review your testimony in Jackson in preparation for today?

A. No, sir.

Q. And are you aware that the Scolaro law firm,

Page 29

the same law firm in this case, was the law firm in that case?

A. No, sir.

Q. How many other cases are you currently reviewing for the Scolaro law firm?

A. One.

Q. This case and another?

A. Yes, sir.

Q. What's the other case?

A. And the -- I can tell you the lead plaintiff is -- I believe that's Terrance Murray.

Q. That's --

A. Yeah, Carnival, perhaps.

Q. All right. Any other cases that you're reviewing against the cruise lines?

A. No, sir.

Q. Any other cases you're reviewing for the Scolaro firm?

A. No, sir.

Q. Have your opinions ever been stricken or limited by any court?

A. No, sir.

Q. We may have to check that. I may have challenged you in Jackson. I don't think there was a ruling.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          Pages 30..33

Page 30

MR. GRAHAM:  Objection.

Q.  (BY MR. DRAHOS)  So have you ever testified in any cases that -- of these 300 and some odd, 356, that involved strokes?

A.  No, sir.

Q.  Anywhere have you executed an opinion that an MRI of the brain was not medically necessary?

A.  Are we talking about of all the cases, again?

Q.  Yes, sir.

A.  None of them, that I recall.

Q.  Anywhere in --

A.  Strike that.  Forgive me.

There -- there may have been an MRI in the emergency department in my review that may not have been medically necessary; and again, these are all trauma -- those are all -- the vast majority of those are all trauma cases.

Q.  Any instances where you've reviewed it from the perspective of how a stroke patient was treated?

A.  None.

Q.  How about a brain injury, perhaps from a trauma?

A.  And is -- what's the question?  Forgive me.

Q.  So have you reviewed a case to determine its reasonableness, both by way of billing and medical

Page 31

treatment, wherein the patient you were reviewing had suffered a brain injury?

A.  I don't recall, since -- since these cases are from the emergency department and that's not typically a test that we get in the emergency department.

Q.  What's not typically a test?

A.  An MRI.

Q.  What do you mean by that?

A.  It's -- it's just not typically a test that we ever need in -- an MRI during a trauma case.

Q.  How about a CAT scan?

A.  CAT scan is routinely necessary.

Q.  Any instances where you've ever determined that a CAT scan was not medically necessary for a patient who was suffering from a suspected brain injury or head trauma?

A.  Frequently.

Q.  And why, ultimately, is that something that would be frequently expressed as an opinion by you?

A.  Because the patient did not meet criteria for the particular study.  The documentation was not in the medical record that supported ordering that particular test.

Q.  So I'm looking over your CV here, which we'll mark as composite Exhibit C.  That includes your

Page 32

testimonial history.

(Whereupon Exhibit Number C was marked for identification.)

Q.  (BY MR. DRAHOS)  And, I mean, one thing that you and I can both agree on, I think, without much dispute is that you've never served in the United States Coast Guard in any capacity.

A.  I -- I have not been designated as a Coast Guard officer; however, as a Navy officer, I supported the Coast Guard for many years.

Q.  Yeah, I suspected you were going to say that; and that's why my question was so precise.  So let me ask it again to make sure that it's clear.

You have never officially held any role in any capacity with the United States Coast Guard.

MR. GRAHAM:  Objection, form.

A.  I was the Coast Guard flight surgeon for the base in New Orleans, Belle Chasse, as the senior flight surgeon aboard the base.  I was assigned to their squadron and supported their mission.

Q.  (BY MR. DRAHOS)  So I happen to know the commanding officer of Belle Chasse for the United States Coast Guard during the time that you were there.

Do you recall his name?

Page 33

A.  I do not.

Q.  Huh.  Your answer is going to go directly to him after this deposition.

Are you saying here today under oath that you are a member of the United States Coast Guard and served as a flight surgeon for them at air station Belle Chasse?

MR. GRAHAM:  Objection, form.

A.  I was the senior flight surgeon aboard Belle Chasse for the time that I was there.  I was a Naval officer that supported their -- their mission.

Q.  (BY MR. DRAHOS)  All right.  You were enlisted in the United States Navy, correct?

A.  I was an officer in the United States Navy, yes, sir.

Q.  All right.  But you were never enlisted in any capacity with the United States Coast Guard?

A.  That's correct.

Q.  Okay.  And this air station Belle Chasse that you've made mention of was a joint military base, correct; it had every branch of the military there, including the Coast Guard?

A.  It -- it had -- I -- I believe it had everyone, in my -- in my recollection.

Q.  Army, Navy, Marines, National Guard, U.S. Coast

Page 34

Guard, correct?

A. Air National Guard, yes, sir.

Q. All right. And so you're not saying here, are you, that during the time period that you served as a Navy -- an enlisted Navy man at air station Belle Chasse that you were the flight surgeon for the United States Coast Guard that would vet their incoming calls for search and rescue?

A. No, that was not my role.

Q. All right. And so you have a doctorate in osteopathic medicine?

A. I have a medical degree in osteopathic medicine, yes, sir.

Q. You are not a medical doctor.

A. I am a medical doctor, yes, sir.

Q. You're a doctor of osteopathic medicine, but you do not hold an M.D.

A. That is not the degree that I earned. I did not earn an M.D. degree. I earned a D.O. degree.

Q. Why didn't you see seek a medical degree?

A. I -- I went to an osteopathic medical school. I did not go to an allopathic medical school where you earn an M.D. degree.

Q. Okay. And I believe I asked you this question in Jackson: Did you apply to any medical schools?

Page 35

A. I -- I applied to both, allopathic and osteopathic medical schools.

Q. Okay. And you did not gain admission to any medical schools?

MR. GRAHAM: Objection, form.

A. Yeah. I accepted the place at -- in Chicago, Chicago College of Osteopathic Medical School, and withdrew the rest of my applications.

Q. (BY MR. DRAHOS) So there wasn't a medical school in this country that accepted you that you rejected, correct?

MR. GRAHAM: Objection, form.

A. Again, I -- I didn't -- I did not get accepted to any of the allopathic medical schools before I accepted the position at the Chicago College of Osteopathic Medicine.

Q. (BY MR. DRAHOS) All right. And so I just want to make sure we're not talking past each other, so to be clear --

A. Sure.

Q. -- because I want to ask you this in front of the jury: You would agree, you have never been accepted into a medical school.

A. Again, that's misleading because osteopathic medical schools are medical school.

Page 36

Q. So you've never been accepted into a university that issues medical degrees.

MR. GRAHAM: Objection, form.

A. Again, perhaps I can clarify it for us.

So an allopathic medical school, you earn an M.D. degree. In osteopathic medical school, you earn a D.O. degree. And the content of the teaching is the same at both, except at an osteopathic medical school you learn about additional teachings.

Q. (BY MR. DRAHOS) Okay. So to use your technology so that we're clear, you've never been accepted into a university that is an allopathic medical school, correct?

A. I would agree with that, yes, sir.

Q. Okay. Now, the deal was, the Navy would pay for your doctorate in osteopathic medicine in exchange for you fulfilling five years of service for them after you obtained your degree, correct?

A. And three years of reserve service, yes, sir.

Q. All right. And you did exactly the minimum, right? You did exactly five years of -- of service time, correct?

A. I did approximately five and a half years of active duty time and three years of reserve time --

Q. Well, according to your CV --

Page 37

A. -- and --

Q. -- you would have starting in June of 1997 and you would have resigned in June of 2002. That's exactly five years.

A. Yeah. Again, I -- I just know, reviewing my DD 214 that it was -- it was over five years. Again, it was within months, you know, less than six months of time, but it wasn't exactly five years.

Q. Okay. So when you left active duty service in June of 2002, you never returned to active duty service, agreed?

A. It -- for periods of time I did while I was in the Reserves.

Q. Right.

A. Yeah.

Q. But the Reserves are different from active duty --

A. Yeah.

Q. -- service, correct?

A. It's a different designation, but you will be on active duty doing training.

Q. So from June of '97 to June of 2002 was active duty, and from June of 2002 to June of 2005 was Reserves, correct?

A. That is correct.

Page 38

Q. All right. And you have not returned in any official capacity to the United States Navy since June of 2005, agreed?

A. That is correct, yes, sir.

Q. All right. So your service time in the Navy, at least as of the last date, was 16 years ago?

A. Somewhere thereabouts, yes, sir.

Q. Okay. Now, while you were in the Reserves, you were asked -- you were actually doing your residency training in emergency medicine, correct?

A. That's correct.

Q. So how much time were you actually spending in the Reserves while you were doing your residency training?

A. We did one weekend a month and two weeks a year on active duty.

Q. Two weeks a year?

A. Correct.

Q. Is that a consecutive week, or it's just 14 days?

A. It usually -- usually it is. And -- actually, strike that.

I -- I just don't recall if I was doing one week and then one week for various training because I do recall it being difficult sometimes to get off,

Page 39

arrange things ahead of time with the residency program.

Q. Okay. So to be sure I got this, though, what I'm trying to figure out is: You couldn't just take a day here, a day there, and fill 14 days up at some point throughout the year? You had to do consecutive days?

A. I think -- I believe that that was the request for -- for certain trainings, especially ones that were out of town.

Q. Okay. So if it was one weekend a month for three years, that means a grand total of 36 weekends?

A. That's correct, yes, sir.

Q. Okay. And two weeks a year, for a total of three years, that would be six weeks in total?

A. So the two, four, six weeks of the two-week time periods?

Q. Yes, sir. So six weeks in total?

A. Six weeks, yes.

Q. All right. So let me go back.

When you first joined the Navy in June of 1997, according to your resumé, you didn't become a flight surgeon until 1999.

So what did you do in the two-year time period between 1997 and 1999?

Page 40

A. So actually, I joined the Navy in 1993. That's when I was sworn in as an officer; and so I was an officer throughout medical school, from 1993 to 1997.

Q. Were you actually serving in the U.S. military during those four years?

A. I did. During -- during our summers, we had to spend at least six weeks time period on active duty either doing training or doing rotations at one of the military hospitals.

Q. Okay. And so in 1997, that would have been when you graduated from medical school, correct?

A. Yes, sir.

Q. And you joined the Navy full-time?

A. That's when I went onto active duty, yes, sir.

Q. Okay. And so from 1997 to 1999, what did you do in your capacity as a full-time active service member?

A. From 1997 to 1998, I was at Portsmouth Naval Hospital in a transitional internship; and from 1998 to 1999 is when I was in Pensacola, Florida, doing my flight surgery training.

Q. Okay. And so when you said you did Portsmouth Naval Hospital, what did you call that, transitional --

A. A transitional internship; like, your first

Page 41

years of the residency is sometimes called an internship.

Q. And you were treating patients at a hospital --

A. Yes, sir.

Q. -- or on the base?

A. It -- well, both. It's the Naval hospital, Portsmouth; so you're treating active duty and their family members.

Q. Okay. And so when you became a flight surgeon, then, in 1999, you served in that role until 2002?

A. Yes, sir.

Q. Okay. And at least according to your own words, when you were stationed at the joint reserve base in New Orleans, your primary duty was to provide primary care services to the active duty flight and support crew for the Navy, correct?

A. That's correct. That was my primary duty, yes, sir.

Q. And then you also made mention of the fact that you performed medical and logistical support for the air show, which was a weekend event?

A. Yes, sir.

Q. Okay. And that would have been, then, a grand total of three air shows that you would have done?

A. It was either three or four because of the time

**Page 42**

period that I, you know, arrived there.  So it was -- I believe it was in October, so however many Octobers there were between 1999 and 2000 -- June of 2000 --

Q.  In that capacity, you were treating not only active duty flight support crew, but any people who were at the show as a -- as just bystanders?

A.  Sure, so -- and we provided first aid for civilians, as well.

Q.  All right.  Were there any instances during these air shows where you ever had to execute a medevac?

A.  No.

Q.  Were there any instances where you had to treat anyone for stroke?

A.  No, sir, not that I recall.

Q.  Were there any instances during the time that you worked at the air station in New Orleans where you treated any active duty flight or support crew for a suspected stroke?

A.  While I was working on the base, no; but while I was working as a -- an emergency physician in town, yes, many times.

Q.  Okay.  So would you agree, then, that in your capacity as a Naval flight surgeon from 1999 to 2002, you never had occasion to actually treat a stroke

**Page 43**

patient?

A.  Oh, that's far from the truth because I would routinely work in the emergency department in Mississippi where I would usually see one every shift or every other shift.

Q.  All right.  Maybe you misunderstood my question, so let me clarify.

You would agree, out -- when you're working as an ER doctor in Mississippi, you're not working as a Naval flight surgeon, correct?  You're working as an ER doctor in an ER room.

What I'm asking you is:  In your capacity as a Naval flight surgeon, was there ever an occasion where in that role you treated a patient for stroke?

A.  I can't say for sure -- certainly not in my clinic; but while we're on call, we have people that would call us and say that they are weak or have -- have symptoms that could be representative of a stroke, but no one that I saw in my clinic during that time period.

Q.  Okay.  And so extrapolating a bit further then, was there ever any instances where, in your capacity as a Naval flight surgeon, you ever were required to execute a medevac for a suspected stroke patient?

A.  That was -- no.

**Page 44**

Q.  You call yourself a senior flight surgeon.

How many other flight surgeons did the Navy have back in the 1999 to 2002 time period?

A.  One, and -- well, it -- at one time there were three and then he left and -- shortly after I arrived and then another flight surgeon arrived, and so the majority of the time there were two -- two of us there.

Q.  What was the other guy's name?

A.  Tyler Prout.

Q.  Can you spell it?

A.  I believe it's P-R-O-U-T.

Q.  And you said there was a guy who left there before you?

A.  His name was Arthur Hawley, H-A-W-L-E-Y.

Q.  Who was the United States Coast Guard's flight surgeon back during the time period that you were there?

A.  I'm not sure if they had one designated to their -- to their unit.

Q.  Meaning designated to Belle Chasse?

A.  Designated to Belle Chasse, yes, sir.

Q.  But certainly, they had a flight surgeon designated to that territory.

A.  I'm not sure.

**Page 45**

Q.  Can you tell me the names of any United States Coast Guard flight surgeons who you ever corresponded with for any reason between 1999 to 2002?

A.  Not at this time.

Q.  Did you ever have reason to correspond with the United States Coast Guard flight surgeon during the time that you served as a Naval flight surgeon?

A.  I don't believe I did.

Q.  And would you agree that during the time that you served as the Naval flight surgeon, you never attended any of the United States Coast Guard flight surgeon training?

A.  That -- that, I can't agree, because I was frequently over there; and I'm not sure if I attended any of their meetings to coordinate anything to be available to them.

Q.  Well, that's totally different than what I'm talking about.

You would agree that you were never trained by the United States Coast Guard to serve as a flight surgeon.

A.  I would agree with that, yes, sir.

Q.  All right.  And so you've never held or maintained any type of licenses or certificates or even rankings of any sort that were issued by the

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    **Pages 46..49**

Page 46

United States Coast Guard, correct?

A. That's correct, I have not.

Q. You've never been to the training center in Mobile?

A. No, sir.

Q. So I'd asked you if you knew who the commanding officer was at Belle Chasse. You didn't know that person.

Can you tell me the names of any United States Coast Guard servicemen or women that you worked with in Belle Chasse?

A. No, sir.

Q. So in your report, you indicate that you at times tagged along with the Coast Guard on some of their search and rescue missions, correct?

A. Yes, sir.

Q. What type of aircraft?

A. Dolphin. I believe it was an HH-65.

Q. How many people does that aircraft hold?

A. Well, when we were flying, we had -- there was a pilot and a copilot, there was myself, and I believe there was one other rescue swimmer when we would go out; so a total of four that I recall. I don't recall there being more than that.

Q. How big is that cabin?

Page 47

A. I'm not sure if I could give you an exact square footage.

Q. Bigger or smaller than this desk that we're standing at or sitting at today?

A. Well, the -- the whole cabin is, you know, approximately this size or -- or bigger, if you're including the pilot space.

Q. What equipment is brought on board for a search and rescue operation?

A. I think that just depends on the mission.

Q. So you're saying there's not a standard set of equipment that's brought, it varies for each mission?

A. I know what -- I would -- I would bring my -- my own bag to prepare for lots of eventualities. I did not know exactly what they were bringing.

Q. So you never stopped to notice what it was they were bringing?

        MR. GRAHAM: Objection, form.

A. I did not -- yeah, I did not look through all of their belongings.

Q. (BY MR. DRAHOS) Okay. And so as you sit here today, then, you couldn't tell me what is in that -- if they even had a version of the U.S. Coast Guard bag to your bag?

A. Again, I'm not exactly sure what they were

Page 48

bringing on board the -- aboard the plane, or aboard the helicopter.

Q. So from 1999 to 2002, in the time that you served as a flight surgeon -- and you make mention of these search and rescue operations that you would go on with them -- how many of those were actually rescue operations?

A. I'm -- I'm not sure if I can tell you how many of them were search and rescue, but I can just tell you that I flew on dozens of -- of missions.

Q. Yeah, and -- and that may be one thing where they're patrolling the coast or something, but I'm -- specific to -- how many instances did you get into -- you said it was a Dolphin?

A. Uh-huh.

Q. -- where you got into the Dolphin helicopter and actually performed a rescue operation of a person at sea?

A. I -- I can't tell you how many times, sir.

Q. More or less than five times?

A. More than five times.

Q. More or less than ten times?

A. I would say somewhere between five and ten times would be a reasonable estimate.

Q. In the total time that you served between 1999

Page 49

and 2002?

A. Correct.

Q. How many of those involved instances where it was an emergency medical situation?

A. I believe they all were.

Q. All five to ten times?

A. I believe they were all were, yes, sir.

Q. How many of those five to ten times involved patients who were suffering a suspected stroke?

A. I don't believe any of them were. I believe they were all trauma.

Q. How many of those five to ten times involved instances where the helicopter was required to travel more than 100 nautical miles from shore?

A. I -- I can't tell you how many -- how far off the coast we traveled.

Q. All right. So let me ask in the reverse then: Can you tell me a single instance where you ever participated in a search and rescue operation of a medically emergent situation of a patient who was located more than 100 nautical miles from shore?

A. I -- I can't tell you the distance of any of the missions that we went on. I just can't -- can't answer that correct -- accurately.

Q. Is that your way of saying none?

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    Pages 50..53

Page 50

A.  No, absolutely not.

Q.  Are you here to say definitively that you participated in at least one instance of an emergent medical situation that was occurring more than 100 nautical miles from shore?

A.  I can't say that I wasn't or didn't.

Q.  But you can't say that you did, either.

A.  Correct, I can't say that I did.

Q.  How about in the instances where you were in the Reserves; how many times did you perform rescue operations in a U.S. Coast Guard helicopter between the years of 2002 and 2005?

A.  None.

Q.  All right.  So can we both then agree that the grand total of your experience in this capacity, regardless of what it involved, ended in the year 2002?

A.  Yes, sir.

Q.  All right.  So it's been 19 years since you've done anything like this?

A.  In any search and rescue missions, and it -- that I have physically gone out on a search and rescue mission, but I've utilized helicopters numerous times for medevac.

Q.  So how about during the time that you served

Page 51

either on active duty or reserve duty -- well, strike that.

Since you haven't done it at all on reserve duty, let me just limit my question to active.  In any of those instances, did you ever perform or be involved in a helicopter evacuation of a patient from a cruise ship?

A.  I -- I can't say because, actually, during -- during my reserve time, while I wasn't specifically doing that, we routinely received helicopter traffic from the Galveston area.  So I -- I can't say exactly where they were coming from.

So during my active time or my reserve time, it -- it may have been civilian -- civilian -- a civilian aircraft.

Q.  Okay.  But that wasn't my question.

I'm talking about the instances of the five to ten times where you've accompanied the U.S. Coast Guard on search and rescue operations.  In any of those five to ten instances, did it ever involve a helicopter evacuation of a cruise ship passenger at sea?

A.  No, sir.

Q.  So would you agree that at no point in time did you ever encounter or have reason to speak with

Page 52

Dr. Ken Harman?

A.  I have never met Dr. Harman.

Q.  All right.  And so would you agree, then, that you have no experience, even as a ride-along passenger with the U.S. Coast Guard, since the time Dr. Harman was named the aviation medical standardization officer with the U.S. Coast Guard?

MR. GRAHAM:  Objection, form.

A.  And when was that?

Q.  (BY MR. DRAHOS)  2008.

A.  All right.  I have not had involvement since that time, no, sir.

Q.  All right.  And so that would then obviously mean that you were never trained by Dr. Harman in any capacity?

A.  Not that I'm aware of.

Q.  Okay.  And that would also mean, then, that you never worked with any United States Coast Guard flight surgeon who was trained by Dr. Harman.

A.  I don't know if he trained anybody that I worked with prior to 2008.

Q.  Okay.  Well, if you haven't worked with the United States Coast Guard flight surgeon since 2002 --

A.  Uh-huh.

Q.  -- you would agree, then, that any flight

Page 53

surgeons that he trained since 2008 you have no experience with?

A.  I would agree.

Q.  So what percentage of your time is currently spent doing legal analysis as -- of an expert nature?

A.  Well, I -- I'm not sure if I can exactly tell you because I'm doing my emergency medicine work and some of this expert witness work concurrently, at the same time.  When I'm not busy on my ER shifts, I will do this type of work, as well.

Q.  So let's do it this way, then:  In 2020, you did 236 cases as a -- as an expert.

A.  Yes, sir.

Q.  So what percentage of your time was spent being an expert in these cases versus a doctor and clinical practice?

A.  I can just tell you I average approximately 300 hours per month in the emergency department and each -- each month; and again, sometimes I'm -- many times, actually, I'm able to do part of my medical/legal stuff while I'm on shift.  So it's not that I divvy it up, this time is to ER time, this time is to medical/legal time.

Q.  All right.  Well, then, what percentage of your income in 2020 was made up of medical/legal work

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    **Pages 54..57**

Page 54

versus clinical work?

A.  Approximately 10 to 15 percent.

Q.  Was medical/legal?

A.  Yes, sir.

Q.  Do you know who Dr. Michael Gonzalez is?

A.  I do.

Q.  Who is Dr. Michael Gonzalez?

A.  If he is the one that you're referring to, he is a physician that runs the telemedicine program for the Houston Fire Department.

Q.  And you claim to be a member of this particular initiative?

A.  The telemedicine program called the ETHAN program, yes, sir.

Q.  What percentage of your time is spent doing that?

A.  Again, we have 24 hours a month doing that.

Q.  You have to spend 24 hours a month doing that?

A.  Yes, sir.

Q.  Okay.

A.  That's -- that's the -- how many times -- how many hours we're given.

Q.  And you would agree that the purpose of that is to avoid unnecessary trips to the emergency room?

A.  No.  The -- the purpose of the program is to

Page 55

appropriately utilize the resources, specifically ambulances, getting patients to the hospital that don't necessarily need an ambulance to the hospital and can go by other means so we can get the ambulance back in service.

Q.  Okay.  But that would also mean what I said, which is avoiding an unnecessary trip to the emergency room for what should normally be a primary care-type of function, agreed?

A.  Sometimes yes, sometimes no.

Q.  All right.  Would you agree that at least according to the studies that have been done, over 80 percent of those calls result in recommendations that the patient not be delivered to the emergency room?

A.  I have not read the statistics on the studies.

Q.  What is your experience?  Does that sound about right with your experience?

MR. GRAHAM:  Objection, form.

A.  I would tell you that the majority of the patients that I see request to go to the emergency room and many times that that's the best place for them; so in my experience, I request a cab to take the people to the emergency room because a clinic is just not the appropriate place for many of the complaints

Page 56

that they have or it's just after hours and the clinics aren't open.

Q.  (BY MR. DRAHOS)  Okay.  So my statistic that I've read off to you, about 80 percent of those calls resulting in recommendations that a patient not be delivered to the ER, is not consistent with your experience?

A.  I -- I would tell you that that is not -- you know, it's quite the opposite, you know.  So probably 10 -- 10-ish percent, maybe, go to the clinics, that we -- that I'll send people to the clinics, and the vast majority I will send to the emergency room for evaluation.

Q.  Do you see those patients?

A.  I -- I can see them on telemedicine.

Q.  No, but I mean --

A.  Oh.

Q.  -- when you make the recommendation that they go to the emergency room, do you ultimately -- are you ultimately the one who sees them?

A.  No, sir.

Q.  And this is a program wherein the patient has to agree to telemedicine?  You can't force them to do it, right?  They have to be a willing participant?

A.  Yeah.  I -- I don't know of the -- the consent

Page 57

situation that the City has -- has set up for that.

Q.  So I see here that you're a Fellow in the United States College -- strike that.

You're a Fellow in the American Academy of Emergency Physicians, but you would agree you've never been a member of the cruise ship medicine section?

A.  That's correct.  I am not a member of the cruise ship section of the American College of Emergency Physicians.

Q.  And you've never worked as a cruise ship physician?

A.  That is correct.

Q.  All right.  And you've never participated in a cruise ship evacuation at sea, of a patient at sea?

A.  Not personally.

Q.  Have you ever spoken to a cruise ship doctor before?

A.  I had -- I don't actually -- I think I had spoken with a recruiter at one time, somebody had contacted me, but not one of the physicians.

Q.  Okay.  So have you ever spoken to any representatives of any cruise lines who work in the shoreside facilities of the medical operations departments?

A.  I'm sorry.  Forgive me.  Could you repeat that?

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**
**Pages 58..61**

Page 58

Q.  Sure.

Have you ever spoken -- let me break it down.

Have you ever spoken to a medical director for any cruise line?

A.  No, sir.

Q.  Have you ever spoken to any members of a cruise line's shoreside medical operations department?

A.  No, sir.

Q.  You've obviously never treated a patient on a cruise ship, correct?

A.  That's correct.

Q.  All right.  Have you ever been in the Medical Center of the Royal Caribbean Brilliance of the Sees?

A.  No, sir.

Q.  Have you ever been aboard the Brilliance of the Seas?

A.  No, sir.

Q.  Have you ever been aboard any Royal Caribbean vessel at all?

A.  No, sir.

Q.  Have you ever been in a cruise ship medical center?

A.  No, sir.

Q.  Have you ever been in a cruise ship at all?

Page 59

A.  No, sir.

Q.  You would agree you've never lectured or written on the subject of cruise ship standard of care, cruise ship medical standard of care?

A.  Not that I can recall.

Q.  And you would agree that you have no experience coordinating an evacuation of a patient from a cruise ship at sea to a shoreside facility?

A.  Correct.

Q.  Which means you've never accepted a patient who's been evacuated from a cruise ship at sea, agreed?

MR. GRAHAM:  Objection, form.

A.  I've never been the primary accepting physician; but again, as I had stated earlier, we frequently received helicopter transports from Galveston, where many of the cruise ships were docked.

Q.  (BY MR. DRAHOS)  Right.

But there's never been an instance where a cruise ship doctor's ever called you had and said, Dr. Totz, here's the patient I'm treating.  We're sending him there.  We want to make sure that you'll accept them.  You've never had any type of communications like that?

A.  Correct, I have not.

Page 60

Q.  And so would you agree that you've never done before what you are evaluating the physicians having done in this case?

MR. GRAHAM:  Objection, form.

A.  I would wholeheartedly disagree.

Q.  (BY MR. DRAHOS)  Okay.  So, I mean, we can agree you've never been a cruise ship doctor, you've never treated a patient in a cruise ship medical center, you've never been involved in any evacuations of a cruise ship medical patient to a shoreside facility, correct?

A.  That is correct.

Q.  All right.  Which means that in this instance where Drs. Blignaut and Radetic were faced with the situation where they had to determine whether or not they wanted their patient from a cruise ship medical center to be delivered to a shoreside facility or not, you've never actually been in that position before?

MR. GRAHAM:  Objection, form.

A.  I wholeheartedly disagree with that, that statement.

Q.  (BY MR. DRAHOS)  How can you disagree?

A.  So you said I've never been in that situation before.  I've -- routinely will have to transport patients by helicopter from a remote location to

Page 61

another location, and the situation is no different.  The thought process that a physician must go through to determine the resources that they need and the resources that they don't have are frequently a part of what I do when I work in remote locations and -- and you need to get the patient to a place where they have the resources, and that's no different than a cruise ship at sea or whether you're out in the back woods of Colorado.

Q.  All right.  So let's talk about that.

When you say "remote locations," you've never been in a remote location at sea, agreed?

A.  I agree.

Q.  All right.  So in the instances where you've been in remote locations, describe them for me, please.  You said "back woods of Colorado" was one?

A.  Yes.

Q.  Okay.

A.  So frequently in -- in Colorado and frequently when I work in West Texas and, because these facilities are very remote from higher levels of care, we frequently will use helicopters and fixed wing aircraft to transport patients that need the higher level of either cardiovascular care or cerebrovascular care.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                     **Pages 62..65**

Page 62

Q. Okay. So when you say "back woods of Colorado," specifically where are you talking about?

A. So Craig, Colorado.

Q. Craig, Colorado?

A. Yes, sir.

Q. When's the last time you were in Craig, Colorado?

A. Last year.

Q. When's the last time you ordered a helicopter transfer of a patient from Craig, Colorado?

A. Last year, every shift almost.

Q. And in each and every one of these instances -- in each and every one of these instances where you've ordered a patient to be transferred from Craig, Colorado, where were you transferring them to?

A. Usually to -- it depends on the resources that were needed. Sometimes we transferred them to Denver if it -- if there was trauma or a child, and sometimes to -- and I -- and forgive me, I -- I can't think of the name of the larger city in southern Colorado, but to other larger cities where just they had further resources.

Q. What was the furthest point that you've transferred a patient from Craig, Colorado?

A. I believe it was Denver.

Page 63

Q. Denver?

A. Yes, sir.

Q. And how far is Craig, Colorado, from Denver?

A. It's about -- by driving, it's approximately four-ish hours.

Q. Four-hour drive?

A. Yes, sir.

Q. And each and every instance where you ordered an evacuation from Craig, Colorado, that involved an instance where the aircraft was able to land on the ground?

A. Well, I'm not sure what you mean.

Q. Has any one of those instances ever involved a situation where the patient had to be hoisted up into the aircraft?

A. No. There's a helipad.

Q. All right. So in every one of those instances, the helipad would land on the ground?

A. The helicopter would land on the ground, that's correct.

Q. Okay. And were these performed by the United States Coast Guard?

A. No, sir.

Q. Were they performed by private ambulance?

A. Yes.

Page 64

Q. Okay. And what about in West Texas; where specifically in West Texas?

A. It is in Alpine, Texas.

Q. When was the last time you were in Alpine?

A. This past week.

Q. When's the last time you ordered a medevac of a patient from Alpine?

A. This past week.

Q. Was this by helicopter?

A. Helicopter and fixed wing.

Q. And so where do you have these patients transferred to?

A. They will either go to El Paso or the Midland/Odessa area.

Q. How far is that from Alpine?

A. Midland/Odessa is approximately two and a half hours by drive, and the El Paso area is about three and a half hours by drive.

Q. And again, in these instances, do they involve any situations wherein the patient would be hoisted up into the aircraft?

A. No, sir.

Q. And so are they, each and every one of them involving circumstances where the helicopter would land on a helipad?

Page 65

A. Yes, sir.

Q. Were any of those transfers performed by the United States Coast Guard?

A. No, sir.

Q. Were they done by private companies?

A. Yes, sir.

Q. Okay.

THE WITNESS: Would you mind if I just took a quick break to run to the restroom and grab a drink of water?

MR. DRAHOS: Yes, that's fine.

(Break taken from 11:10 a.m. to 11:18 a.m.)

Q. (BY MR. DRAHOS) So, Dr. Totz, when we left off, we were talking about your experience in these remote areas of Alpine and Craig, Colorado. Anywhere else?

A. Not that I frequently will transport people by -- by ambulance or by helicopter.

On occasion, when I work in Arizona, we will, but not nearly as frequently.

Q. When you work in Arizona?

A. Yes, sir.

Q. And that would be the same circumstance, obviously, as what we talked about Alpine and Colorado

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    Pages 66..69

Page 66

where these involve helicopters landing, putting the patients in them, and then flying off, correct?

A. Landing on the ground, yes, sir.

Q. So what exactly is your role in this case?

A. What do you mean?

Q. Exactly as I just said it: What's your role in this case?

A. My -- my role is to provide an opinion on the care that was delivered by the medical staff aboard the -- aboard the cruise ship and whether the -- whether the medical staff should have reached out for -- for a higher level of care off -- off the ship.

Q. Yeah. That's what I thought.

How are you a rebuttal expert?

A. How am I a rebuttal expert?

Q. Yeah.

MR. DRAHOS: Tom, how is this a rebuttal expert?

MR. GRAHAM: Just ask him your questions, please. You're not here to depose me.

Q. (BY MR. DRAHOS) All right. I'll ask you Dr. Totz: How are you rebuttal expert in this case?

MR. GRAHAM: Objection, form.

A. I -- I -- if you could ask me a specific question.

Page 67

Q. (BY MR. DRAHOS) Well, you're a lawyer, right?

MR. GRAHAM: Objection, form.

A. I'm not a practicing lawyer.

Q. (BY MR. DRAHOS) You have a law degree?

A. I do.

Q. So you know what the word "rebuttal" means, don't you?

A. I do.

Q. Okay. So who are you rebutting in this case?

A. The medical care that was delivered here and the decision to keep Mrs. Godwin aboard the ship and not seek any other evaluations or opinions with -- with her care.

Q. All right. So then, you're not issuing a rebuttal opinion, you're issuing a standard of care opinion.

A. I -- I -- I'm not sure what...

Q. You don't know what that means?

A. I -- I -- I'm not sure what you're asking.

MR. GRAHAM: And I'm just going to object to the question.

THE WITNESS: Yeah.

MR. GRAHAM: His opinions are clearly outlined in his report.

MR. DRAHOS: No. They're cumulative.

Page 68

That's the problem.

Q. (BY MR. DRAHOS) Okay. We'll address that later with the Court.

For now, let me ask you what questions I at least have about your report.

I think you told me earlier you'd never heard of Ken Harman while you were in the Navy?

A. Correct.

Q. All right. I mean, how much do you know about Dr. Harman?

A. Just from what I read in his reports.

Q. Did you review his CV?

A. I -- I did, and his reports.

Q. Why did you call him a "defense family medicine trained flight surgeon"?

A. Because that's what he is.

Q. Okay. Did you intend to use those words in a disrespectful manner?

MR. GRAHAM: Objection, form.

A. Dr. Harman is providing a -- not only an opinion as a flight surgeon, but he's providing an opinion as a medical expert on -- on stroke, stroke care. And he's trained in family medicine; and per his CV, I'm not even sure if he's practiced medicine since 2014. I'm not even sure if he's ever had the

Page 69

opportunity to take care of a stroke patient, acute stroke patient, ever. So how he is providing a medical opinion as a family medicine doctor, I'm not really so sure.

I can't figure out why there's not a neurologist or a stroke doctor or a -- an emergency medicine physician providing a medical opinion on the care that was delivered here or the lack of care.

Q. (BY MR. DRAHOS) Well, did you not review the expert opinion of Dr. Merkler?

A. I have not seen that.

Q. How about Dr. Curry?

A. I've not seen that.

Q. So -- all right. Let's talk about what apparently you did review, which was Dr. Harman.

So, I mean, do you even know what the aviation medicine standardization officer is with the United States Coast Guard?

A. I don't.

Q. Okay. And so do you know that Dr. Harman is the one who wrote the Coast Guard's policies and procedures for medevac operations that is used nationwide throughout the Coast Guard today?

A. I -- I don't know if those are --

MR. GRAHAM: Objection, form.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    **Pages 70..73**

Page 70

A. -- currently used.

Q. (BY MR. DRAHOS)  Okay.  You didn't do any research to determine whether or not they were?

A. I -- I don't know if they're -- his particular --

Q. Okay.

A. -- writings are currently used.

Q. Did you notice that he served over 12 years active service as the U.S. Coast Guard flight surgeon?

A. I noted that he was in the -- that he retired from the Coast Guard.

Q. All right.  Well, that's actually not true, sir.

Are you aware of the fact that he currently trains all incoming flight surgeons at the United States Coast Guard Aviation Training Center in Mobile?

MR. GRAHAM:  Objection, form.

A. I'm not aware that that has anything to do with stroke care.

Q. (BY MR. DRAHOS)  Okay.  Well, I can assure you it does.

So the question is:  Are you aware of the fact that he currently trains all incoming flight surgeons at the United States Coast Guard Aviation Training Center in Mobile?

Page 71

A. I'm not aware that he does that.

Q. All right.  And so you're not aware, then, that he actually trains all senior aviation leadership, all U.S. Coast Guard Command Center senior leadership, and all active flute duty surgeons since 2008?

MR. GRAHAM:  Objection, form.

A. I'm not aware of his specific duties other than what's outlined --

Q. (BY MR. DRAHOS)  And even though you're aware of the fact that you call him retired, he currently serve as an auxiliary flight surgeon for the United States Coast Guard as recently as March of 2020.

A. Yeah, and I'm not aware that that has anything to do with his opinions on stroke care.

Q. Right.

So if he's the guy who writes the policies and trains the flight surgeons on how to respond to a call made from a cruise ship on any particular day for any particular occasion, wouldn't you agree that he is eminently more qualified than you are to explain to the jury how the Coast Guard responds to calls of that nature?

MR. GRAHAM:  Objection, form.

A. Dr. Harman is a physician, I mean; but he is not an acute care physician.  And so he may not and

Page 72

very likely does not understand the standard of medical care, and the Coast Guard does not write the standard of medical care.

Q. (BY MR. DRAHOS)  But it's the Coast Guard who responds to the call from the cruise ship, correct?

A. And that's why a flight surgeon is --

Q. Just answer my question.

Correct?  It's the Coast Guard who responds to the call from the cruise ship for a medevac, correct?

A. Correct.

Q. All right.  And so it's the Coast Guard's policies and procedures that are followed in this case, not ones from Alpine, Texas, or Craig, Colorado, agreed?

MR. GRAHAM:  Objection, form.

A. And the -- the response from the Coast Guard is predicated on the specific clinical situation that is going on aboard; and so while you may have a policy in place, there -- that's why you have a physician on call, because many times it can be necessary to deviate from the policy because medical care changes a lot more quickly than the Coast Guard references.

Q. (BY MR. DRAHOS)  You mean a flight surgeon on duty, correct?

Page 73

A. Flight surgeon on duty or --

Q. Well --

A. -- calling -- reaching out to a different type of specialist.

Q. Maybe I should just ask you:  What's your understanding of how a helicopter evacuation from a cruise ship is performed?

A. It just depends what type of cruise ship it is.

Q. All right.  The Brilliance of the Seas.

A. So the Brilliance of the Seas has a helipad. So the helicopter could land on the helipad if it is -- if -- if the helicopter -- the confirmation of the helicopter is able to land on that particular helipad.  And again, I don't know all the --

Q. The United States Coast Guard helicopter.

A. I -- I don't know which one would be dispatched, and so it would perhaps depend on the helicopter.

Q. All right.  Are you saying that the helicopter that John Pierce is testifying to would have been the one used in this case, could have landed on the Brilliance helipad?

MR. GRAHAM:  Objection, form.

A. I can't say that I'm -- I just don't know --

Q. (BY MR. DRAHOS)  All right.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          **Pages 74..77**

Page 74

A. -- that that one in particular could have.

Q. So let's say that Dr. Blignaut or Dr. Radetic determined that Mrs. Godwin should be medevac'd from the cruise ship on the night in question. What do they do?

A. Again, they have their policies and procedures that they -- that they go through to reach out to -- either calling their medical operations or -- and/or if they can go directly to the Coast Guard themselves to arrange a medevac.

Q. What are the policies and procedures?

A. I don't have those.

Q. You don't know them?

A. I -- I don't have or know them.

Q. Do you know the policies and procedures for the Coast Guard?

A. Which ones?

Q. For medevacs.

A. Oh, I don't and -- nor can I enumerate the specific procedures --

Q. So let me be clear --

A. -- other than their checklist that they go through.

Q. Let me be clear: As you sit here today, you don't know the policies and procedures for a medevac

Page 75

operation from a cruise ship as, say -- either from the perspective of the cruise line or the United States Coast Guard?

MR. GRAHAM: Objection, form.

A. I know -- I know that the process that they go through, the checklist that they go through to -- that -- whether the -- whether the -- the mission is a reasonable mission.

Q. (BY MR. DRAHOS) What checklist?

A. There's a -- a -- a work list that they will -- will go through to assure that the mission is, you know, appropriate, that they're able to get to a particular facility on time, if -- and again, I don't have the checklist in front of me.

Q. Right.

So have you ever seen the checklist?

A. Sure.

Q. So what's on it?

A. Again, I don't have it in front of me and I can't --

Q. So --

A. -- recite it to you completely.

Q. -- you're here completely to rebut -- at least it's been pitched this way to me, so I'm now sitting here asking you questions -- that you're here to rebut

Page 76

the medicine aviation standardization officer, Ken Harman, on how the U.S. Coast Guard policies and procedures were either followed or not followed in this circumstance. And you're telling me that you don't know the cruise line's policies and procedures and your understanding of the Coast Guard's policies and procedures is a checklist?

MR. GRAHAM: Objection, form.

Q. (BY MR. DRAHOS) And you don't have that with you?

A. There -- there was no procedure followed because none was initiated in this case.

Q. So what procedures should have been followed then?

A. Well, first, the physicians on board should have reached out to their medical operations and told them that, We have a stroke on board, an acute stroke on board.

And because Dr. Radetic had never seen a stroke in the last 25 years of practice, he didn't recognize it; and then after determining that there's an acute stroke on board that had receptivity to medical treatment, acute medical treatment off the ship that the ship couldn't provide, then reaching out to the Coast Guard to arrange for transport.

Page 77

Q. To arrange for transport.

What happens next?

A. Then the Coast Guard will vet the request, and they go through their process and -- just like they routinely do every day.

Q. What is their process?

A. They -- and I can't enumerate every specific process that they will go through.

Q. It's because you don't know the process, correct?

MR. GRAHAM: Objection, form.

A. I -- I can tell you the general process.

Q. (BY MR. DRAHOS) The general process from having done ride-alongs 19 years ago?

MR. GRAHAM: Objection, form.

A. The -- the process is how they vet the particular call; and if the -- the particular case meets the their criteria, then -- then --

Q. (BY MR. DRAHOS) What is --

A. -- then you -- then they come and get the patient.

Q. What's their criteria?

A. Well, it just depends on the situation.

Q. What do you mean, it depends on the situation? What's their criteria for when they determine whether

Page 78

or not a call's appropriate?

MR. GRAHAM:  Objection, form.

A.  Well, that's why -- one of the reasons why that a flight surgeon is involved, to see if the -- the care can be delivered that is not available off the ship in a timely fashion that is -- that is needed off the ship.

Q.  (BY MR. DRAHOS)  Okay.  What else is part of their criteria?

A.  Certainly whether the -- the ship is within a -- a distance that they can get to it, whether there's weather issues that may preclude being able to get -- get to the ship or anything that, you know, makes the risk exceed the benefit.

Q.  And so is it your testimony here today that the flight surgeon will determine the appropriateness of a call and it varies from flight surgeon to flight surgeon?

A.  No.  They -- the -- it just depends on what medical situation is aboard.

So the flight surgeon will determine if the -- if there are medical benefits that can be achieved by removing the patient from the ship, and the other members of the team will make the determination whether the -- whether it's feasible,

Page 79

operationally feasible to --

Q.  Okay.

A.  -- to pick up the patient.

Q.  And how about as it relates specifically to a suspected stroke patient?  What's the criteria that the Coast Guard follows?

A.  Again, that's going to depend on each situation.

Q.  That's your understanding, it depends on each situation?

A.  Well, again, for -- if you're asking me about the medical issues that need to be addressed, again, that -- that's what's going to depend on each situation.  If you're asking me about the operational feasibility, again, that's another issue.

Q.  I'm talking about the flight surgeon who receives a call concerning a suspected stroke patient on a cruise ship, what is the criteria that he follows in determining whether or not it's an appropriate call?

A.  I don't believe there is any specific criteria that is followed for a suspected stroke because each person that presents with stroke-like symptoms may be something else other than a stroke.  So again, it's just a "depends."

Page 80

Q.  Did you read the aeromedical technical bulletin in this case?

A.  I did.

Q.  You did?

A.  Yes.

Q.  When?

A.  Shortly after you submitted it to the plaintiff's attorney.

Q.  So you read it on Friday?

A.  It was within the -- this past week.

Q.  All right.  Well, I gave it to plaintiff's counsel on Friday.  That means you had to have read it between Friday and today, correct?

A.  Yeah, if that was the day.

Q.  And you didn't notice anything in there specific for strokes?

A.  I noticed that the article of that bulletin was from 2010 -- 2010, prior to modern stroke care, and didn't include even modern stroke care that was available in 2008; and I noticed that that bulletin was written by the Coast Guard and is not a medical document and does not represent the standard of care in medicine.

MR. DRAHOS:  Move to strike as nonresponsive.

Page 81

Q.  (BY MR. DRAHOS)  Did you notice anything in the aeromedical technical bulletin that related to stroke specifically?

A.  There were some issues in there related to stroke.

Q.  What were the issues?

A.  Will you show me what you're referring to?

Q.  No.  I'd prefer to ask you what you recall reading.

A.  Oh.

MR. GRAHAM:  Objection.

A.  If you can show me exactly what you're referring to, I'm happy to review it again.

Q.  (BY MR. DRAHOS)  So you don't remember?  The central part of this case being how a stroke patient was handled, you don't recall whether or not there was any language specific in the United States Coast Guard Aeromedical technical bulletin related to strokes?

MR. GRAHAM:  Objection, form.

A.  There was a paragraph in there that related to treating a stroke patient within three hours that it was -- if the -- they could not deliver a patient to appropriate care within three hours, that it was not worth pursuing.

Q.  (BY MR. DRAHOS)  All right.  Now, it appears to

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          **Pages 82..85**

Page 82

me that you just disagree with that, as an ER physician.  But would you agree that you have no evidence to suggest that that is not the uniform policy of the United States Coast Guard?

MR. GRAHAM:  Objection, form.

A.  There -- what is not?

Q.  (BY MR. DRAHOS)  Do you have any evidence as you sit here today that every flight surgeon who picks up a call to consider a suspected medevac of a cruise ship passenger at sea does not apply the three-hour standard that was written by Dr. Harman?

MR. GRAHAM:  Objection, form.

A.  Oh, I could wholeheartedly say that that doesn't apply because I -- you can read numerous articles in the -- within the news on a -- on almost a daily basis, even from where Dr. Harman was stationed in Kodiak, Alaska, during the time period that this was going on, where they went on multi-hour medevac missions that required refueling along the way.  They clearly were going to be longer than three hours, but they continued to pursue the mission.

Q.  (BY MR. DRAHOS)  Where are those articles?  Do you have a single one here today with you?

A.  I'm not sure if I have noted those in my --

Q.  There isn't a single one in here.

Page 83

So can you give me a specific instance where you can recall a flight surgeon overruling the United States Coast Guard three-hour window for stroke patients?

A.  It happens frequently.

Q.  You say "frequently," but that doesn't mean anything to me unless you can tell me a specific instance.

A.  I'm happy to provide --

Q.  Too late, Doctor.

MR. GRAHAM:  Objection.

Q.  (BY MR. DRAHOS)  You have until today.

MR. GRAHAM:  Objection.

Q.  (BY MR. DRAHOS)  So do you have a specific instance that you can point to to tell me where in a United States Coast Guard flight surgeon overruled the three-hour window?

A.  In Kodiak, Alaska, in -- I believe it was October of 2018, there was a -- a search and rescue mission, medevac mission off one of the cruise ships that required multiple refuelings by the Coast Guard helicopter.

Q.  Okay.  Was that a stroke patient?

A.  I believe it was a stroke patient, yes, sir.

Q.  What's the person's name?

Page 84

A.  Again, I don't know if the article divulged the patient's name.

Q.  Where was that article written?

A.  I read it online.

Q.  Where was it published?

A.  I'm not sure of the exact publication.

Q.  Do you have any personal knowledge of any instances where a United States Coast Guard flight surgeon overruled a three-hour window for a stroke on a cruise ship passenger at sea?

MR. GRAHAM:  Objection, form.

A.  If they didn't, then they would be violating the standard of care in medicine.

MR. DRAHOS:  Move to strike as nonresponsive, and I'll ask it again.

Q.  (BY MR. DRAHOS)  Do you have any personal knowledge of any instances where a United States Coast Guard flight surgeon overruled a three-hour window for a suspected stroke patient requesting a medevac at sea?

MR. GRAHAM:  Objection, form.

A.  I don't have the specific overruling documents.

Q.  (BY MR. DRAHOS)  So I'm going to ask you the question again then:  Who do you think is more qualified to render analysis or to explain to the jury

Page 85

what the United States Coast Guard's policies and procedures are for determining whether or not a medical evacuation of a cruise ship passenger at sea is warranted, Dr. Ken Harman or Dr. Ken Totz?

MR. GRAHAM:  Objection, form.

A.  I -- I can tell you that my medical opinions are far more in line with modern stroke care for this patient than Dr. Harman can provide.

MR. DRAHOS:  Move to strike as nonresponsive.

Q.  (BY MR. DRAHOS)  You may differ on what the proper standard of care is for a stroke patient, but wouldn't you agree that as we sit here today, Dr. Harman is more qualified to explain what the Coast Guard's policies and procedures are than you are?

MR. GRAHAM:  Objection.

A.  I believe that Dr. Harman spent more time in the Coast Guard and -- and likely has and does have a lot more familiarity with their processes.

Q.  (BY MR. DRAHOS)  Okay.  So you write here in your report that the standard of care for a physician practicing in any acute care setting, whether it's the ER or a cruise ship, is to obtain a thorough history of the presenting illness from the patient, perform a thorough physical exam commensurate with the

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          **Pages 86..89**

Page 86

presenting complaint, development a reasonable differential diagnosis of potential problems based on the history and physical exam, perform necessary diagnostic testing to rule in or rule out potential diagnoses, and timely consider the need to transfer the patient to the appropriate facility or specialist.

Those were your words, correct?

A. That sounds like my words.

Q. All right. So in the instance of a suspected stroke patient, how much time should a physician take to obtain a thorough history of the presenting illness?

A. It can take anywhere between five and ten minutes.

Q. How much time should a physician spend to perform a thorough physical exam?

A. Anywhere from five to ten minutes.

Q. How much time should the physician spend to develop a reasonable differential diagnosis?

A. Just a -- a minute or two.

Q. How much time should a physician spend to perform necessary diagnostic testing to rule in or out potential diagnoses?

A. It just depends if there's any diagnostic testing that needs to be done.

Page 87

Q. How about for a suspected stroke patient?

A. It should take about 30 seconds to do a glucose test.

Q. 30 seconds to do a glucose test?

A. To prick the finger and put the blood on the -- for the monitor. That's -- that's it.

Q. How long does it take for the results to come back?

A. And again, that's within the 30 seconds.

Q. Any other diagnostic testing other than glucose?

(Cell phone ringing.)

A. I'll wait for you to finish.

Q. (BY MR. DRAHOS) Any other diagnostic testing?

A. In -- in this situation, there wasn't any.

Q. No other need for any other diagnostic testing?

A. That was the most critical one that needed to -- needed to take place, perhaps an EKG.

Q. How long does it take to do an EKG?

A. A minute or two.

Q. And how long should the physician spend considering whether or not to perform an at-sea evacuation?

A. Within a minute.

Q. Within a minute?

Page 88

A. Within a minute.

Q. All right. So what you're saying is in the context of a suspected stroke patient, the physician can ultimately do a history, perform a thorough physical exam, complete a differential diagnosis, do all diagnostic testing, and consider an evacuation within -- looks like you've got 21 minutes?

A. That sounds reasonable.

Q. Is that in the context of a shoreside specialist or a cruise ship doctor?

A. Either.

Q. So you believe that a cruise ship physician should be able to do that within 20 minutes?

A. If they've been adequately trained and can recognize what a stroke is.

Q. Well, how long should they -- strike that.

What does a cruise ship medicine doctor have to consider when he's trying to determine whether or not to perform an evacuation or request an evacuation?

A. Well, first of all, they need to come up with a differential diagnosis of the potential diagnoses that may be at play and then consider whether they have the resources on board to address the treatment for all of those; and if they don't and it is an emergent

Page 89

situation, such as an acute stroke, then the first thought is, where can we get this type of care.

And in this situation the care was not available on the ship.

Q. All right. So if I understand you correctly, then, what you're saying is that a cruise ship doctor should be able to, within 20 minutes, determine whether or not an evacuation at sea is medically warranted? Is that what you're saying?

A. Yes, sir.

Q. And so is what you're saying the minute that this physician reaches that conclusion, he should call the Coast Guard?

A. Just depends what the policy of the ship is. If the ship allows them to contact the Coast Guard directly, that's fine. If their policies require them to go through their medical operations for each and every case, that may be reasonable, as well.

Q. Well, what was the policy at Royal Caribbean?

A. Well, Dr. Radetic had indicated that they were supposed to call med ops.

Q. Did you read the deposition testimony of Dr. Blignaut?

A. I did.

Q. Who was more senior, Dr. Radetic or

Page 90

Dr. Blignaut?

A. Dr. Blignaut.

Q. So how much time typically does it take for a cruise ship doctor to contact med ops and discuss every case, which you find to be a reasonable practice?

A. I don't know how long it specifically takes them. I indicated that someone was available 24 hours a day in the Miami area.

Q. Okay. What else does a cruise ship doctor need to do before contacting the United States Coast Guard?

A. I'm not sure what you're asking.

Q. So I'm asking you what Dr. Blignaut or Dr. Radetic should have done in this case. Obviously you're of the opinion that they should have ordered a helicopter evacuation. So so far you've given them 20 minutes to make that decision.

What else in the course of this decision-making process do they need to do in order to facilitate that type of an operation?

A. I'm still not sure what -- what you're asking.

Q. Okay. Why is it unclear what I'm asking?

A. I -- I --

MR. GRAHAM: Objection, form.

Q. (BY MR. DRAHOS) Well, we're up to the point

Page 91

where you've given them 20 minutes to reach the decision that they think it's medically warranted. Now you're telling me, well, they may have to call their med ops department to discuss the case.

You don't know how long it would take to do that, correct?

A. Well, it shouldn't take very long, more than five minutes to discuss the case with their medical operations, that they have an acute stroke.

Q. All right.

A. And...

Q. So they're to call their med ops department, tell them they have an acute stroke, and that's going to take a grand total of five minutes?

A. To convey the history that should have been obtained.

Q. What do they do after they are done with their phone call?

A. And I -- I gather if they're -- and this is just a -- speculation, that if their med ops approves it -- I don't know if they need med ops approval or if they can overrule their med ops or if they can go straight to the Coast Guard for requesting a medevac.

Q. You don't know?

A. That's correct. I don't know what their

Page 92

specific policy is and if they're able overrule their medical operation.

Q. Well, who contacts the Coast Guard?

A. I -- I don't know if the physicians on board have the express authority to call them directly or if they need for their medical operations to call them.

Q. So you don't know who it is that would call the Coast Guard?

A. I would suspect that the physicians would call them directly so they could directly convey the clinical situation aboard the ship and they could speak with the flight surgeon, who will ultimately have the medical discretion to give the approval.

Q. Do you know that one way or another, or are you guessing?

A. No, I'm -- I'm just telling you what would be a reasonable scenario.

Q. You don't know that to be the case, though?

A. I don't know if that's the case in every situation.

Q. So regardless of who it is from the cruise line who contacts the Coast Guard, how long, typically, is that process between the communication between the cruise ship and the Coast Guard?

A. According to Dr. -- or excuse me --

Page 93

Mr. Pierce's report, that takes approximately 10 to 15 minutes.

Q. Do you know how long it's been since Mr. Pierce allegedly was involved in any type of a cruise ship evacuation?

MR. GRAHAM: Objection, form.

A. I don't.

Q. (BY MR. DRAHOS) So you're relying upon Mr. Pierce, but you don't know how relevant or how even applicable his experience even would be to this type of a circumstance, do you?

A. I -- I don't know --

MR. GRAHAM: Objection, form.

A. -- his relevant recent experience.

Q. (BY MR. DRAHOS) So are you telling the members of the jury that you think because Mr. Pierce says it takes 10 to 15 minutes to speak to the United States Coast Guard about a deep-sea middle of the night hoist operation of a cruise ship passenger, that that must be the circumstances each and every time?

MR. GRAHAM: Objection, form.

A. I can't say that I know that that's the case every time.

I know that I've called the Coast Guard on numerous occasions to ask them the -- if this is, you

**Page 94**

know, the number where we can request a -- a medevac aboard a ship and they answered the phone and they asked me if I need to speak with somebody right when I call, and I've done that numerous times.

Q.  (BY MR. DRAHOS)  Wait.  You called the United States Coast Guard on numerous occasions to request a medevac aboard a ship?

A.  No.  I asked them if I was out at sea aboard a ship, is this the number that I would call to institute a -- initiate a medevac off -- off of a ship.

Q.  When did you do that?

A.  This was within the last month.

Q.  Why did you do that?

A.  Because I was wanting to know what the specific process was and how easy it was to request a medevac.

Q.  What number did you call?

A.  And I -- I -- I can't tell you the exact number --

Q.  Who did you speak to?

A.  -- that I called.

I can't tell you exactly who I spoke with, but it was a 1-888 number.

Q.  So you just randomly called some Coast Guard number and asked, Hey, is this the number I'm supposed

**Page 95**

to call for cruise ship evacuations and they said yes?

MR. GRAHAM:  Objection, form.

A.  I called the Coast Guard station in -- I believe it was Clearwater and Fort Myers.

Q.  (BY MR. DRAHOS)  Do you know anything more beyond -- what it's like to contact the Coast Guard than that?

A.  Such as?

Q.  How long does it take to get a flight surgeon on the phone in the middle of the night?

A.  It just depends.  I -- I -- I imagine --

Q.  You don't know?

MR. GRAHAM:  Objection, form.

A.  -- they're on call.

Q.  (BY MR. DRAHOS)  Who was the on-call flight surgeon for the United States Coast Guard back in December of 2018?

A.  I don't know.

Q.  Where was this particular person located?

A.  I don't know.

Q.  What was their background, training, and experience?

A.  I don't know.

Q.  What number would you have called to reach that person?

**Page 96**

A.  I would have to look it up online and/or if I were on the -- aboard a ship, that should be readily available.

Q.  So in other words, if -- strike that.

As you sit here today, you do not know who the flight surgeon would have been, where that person would have been located, what time of the day it would have been for them, what their training was, or how they would have interpreted the call?

A.  I -- I -- I don't know where they would have been or where they were in the -- in the world, correct.

Q.  And so wouldn't you agree with me that if you don't know who it would have been, where they would have been located, what their availability would have been like, you have no idea how long that would have taken, that process?

A.  Well, if somebody's on call for a search and rescue mission, certainly their prompt response to a -- a request for assistance is -- is not -- not going to be a lengthy process.

Q.  Could you tell me how long it's going to take?

A.  I can't tell you specifically how long it -- it would take.

Q.  And is the flight surgeon the one and only

**Page 97**

person who determines whether or not the Coast Guard's going to come out for a cruise ship evacuation?

A.  No, sir.

Q.  Who else is involved?

A.  There will be operations personnel that are involved in the situation, as well.

Q.  And would you agree that you have no experience or training whatsoever on that side of the equation?

A.  I don't.

Q.  And do you know how long it takes them to make a decision as to whether or not they're going to accept the call?

A.  I would have to refer to Dr. -- or excuse me -- Mr. Pierce's -- his report, again, for the specific times.

Q.  All right.  In other words, you don't know, correct?

A.  I -- I can tell you what I put in my report, if I had my report in front of me; and I can tell you what Mr. Pierce suggested in his report.

Q.  Where is your report?

A.  I have it digitally or -- you know, or have it here.

Q.  Okay.

A.  Would you like me to look at it?

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          **Pages 98..101**

Page 98

Q.  Not at the moment.  I'll ask you in a minute.
Thank you.

A.  Okay.

MR. GRAHAM:  Could we take another short break when you get to a good point?

MR. DRAHOS:  Yeah, I mean, as long as you guys aren't going to be conferring.

MR. GRAHAM:  I just want to get water.

And how long do you have, approximately?

MR. DRAHOS:  I should be wrapped up here, I would say, in less than an hour.

MR. GRAHAM:  Okay.

(Break taken from 12:00 p.m. to 12:05 p.m.)

Q.  (BY MR. DRAHOS)  So, Dr. Totz, as I recall your testimony, you had told me that you were retained in the middle of April and then you finished this report on -- I'm sorry, you were retained in the middle of March and you finished this report on April 2nd, correct?

A.  Yes, sir.  That's the approximate time frame.

Q.  So about two weeks to prepare the report?

A.  Correct.

Q.  How much time did you spend writing the report?

Page 99

A.  Approximately ten hours or so.

Q.  Were you careful to try and get all the details correct?

A.  I -- I usually am.

Q.  Okay.  And should all of the details be correct in here?

A.  They should be.

Q.  All right.  If you got some of the details incorrect, would that be indicative of perhaps this report not being entirely reliable?

MR. GRAHAM:  Objection, form.

A.  If -- if -- if the facts were either incorrect or new information came to me that would prompt me to change my opinion in there, I would provide a supplemental report.

Q.  (BY MR. DRAHOS)  You advised in your report that Dr. Radetic was the first physician to evaluate Mrs. Godwin, correct?

A.  That is what -- he was the first one in the medical record to document a physical exam.

Q.  Okay.  Are you of the opinion in this case that Dr. Radetic was the first doctor to assess Mrs. Godwin?

A.  I -- I don't know if I -- it was either he or Dr. Blignaut that was the first one to specifically

Page 100

assess him.  I just know what's documented in the medical record.

Q.  All right.  Did you read -- you read Dr. Blignaut's testimony, correct?

A.  I read his deposition, yes, sir.

Q.  All right.  So which one presented to Mrs. Godwin's cabin, Dr. Blignaut or Dr. Radetic?

A.  I -- I understood that they both did.

Q.  Okay.  And so is it your testimony here today that Dr. Blignaut was not the first one to assess Ms. Godwin?

A.  I understand that Dr. Radetic, since he was on duty at that time, was the first physician to respond.

Q.  So where are you getting that from exactly?

A.  Again, from the medical record, what his documentation was.

Q.  Okay.

A.  What -- what -- the physical exam documentation, so that's what I'm going on is who examined the patient first, was the patient -- was the physician that documented their physical exam in the medical record.

Q.  So if it was actually Dr. Blignaut who did the first assessment, then you're wrong?

A.  And if it was Dr. Blignaut that did the first

Page 101

assessment, I would be incorrect.  But that's not what the medical record suggests.

Q.  In this report, you indicated here that both Dr. Radetic and Dr. Blignaut deviated from the standard of care by not performing the necessary physical exam elements to quantify an NIHSS.  That would be the NIH stroke score assessment, correct?

A.  Yes, sir.

Q.  All right.  And if you'd read Dr. Blignaut's testimony, was he asked whether or not he performed an NIH stroke scale assessment?

A.  He -- he endorsed that -- that it's not memorialized in the medical record.

Q.  All right.  So if Dr. Blignaut indeed did do an NIH stroke score assessment, then you would be wrong?

MR. GRAHAM:  Objection, form.

A.  And I -- I have no way of knowing that he actually did -- did it since it wasn't documented in the medical record.

Q.  (BY MR. DRAHOS)  Well, he said that he did it.

MR. GRAHAM:  Objection, form.

A.  That's what he said.

Q.  (BY MR. DRAHOS)  Okay.

A.  If he -- if he understood that it was such an important part of stroke care, why didn't he

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          Pages 102..105

Page 102

memorialize it in the medical record?

Q. Are you saying that because it's not in the record, he didn't do it?

A. I'm saying I have no corroboration that he ever did it.

Q. How about his deposition testimony?

MR. GRAHAM: Objection, form.

A. You'll have to look at him to see if, you know, he perjured himself during his deposition.

Q. (BY MR. DRAHOS) Okay. So according to doctor -- well, strike that.

What was Dr. Blignaut's NIH stroke score?

A. He alleged that it was a three.

Q. What is that indicative of, a minor, moderate, or major stroke?

A. It just depends.

Q. Well, the NIH stroke score assessment is on a scale of 0 to 42, correct?

A. Yes, sir.

Q. All right. Zero being no stroke, 42 being the maximum, strongest stroke there could be -- death, I think.

A. Sure.

Q. All right. So where does three fall on the scale -- on the NIH stroke score assessment?

Page 103

A. It just depends because you can get a score of three for being blind, you can get a score of three for being mute, and I think most of us would consider that to be a major stroke, irrespective of the number on the NIH stroke scale.

Q. Was Mrs. Godwin blind at any point in time during the subject cruise?

A. Not that I'm aware of.

Q. Was she mute at any point in time during the subject cruise?

A. She was not mute that I'm aware of, no.

Q. And you would agree that Dr. Blignaut was in a far superior position than you were to determine both the severity of her visual deficits, if any, or speech deficits, correct?

MR. GRAHAM: Objection, form.

A. I'm simply refuting your assessment that -- that a three is a minor stroke versus ten being a moderate stroke or something higher being a major stroke. A three -- a lower score can be a -- a major stroke.

Q. (BY MR. DRAHOS) Right.

And I know that you hired gun plaintiff experts like to try and exaggerate, which is why I'm following up with specifics.

Page 104

MR. GRAHAM: Objection, form.

A. Sure.

Q. (BY MR. DRAHOS) In this particular case there was no evidence of her having any type of blindness or mute [sic] during any part of the time she was on the cruise ship, correct?

A. I'm simply providing an example of where a low NIH stroke score can be indicative of a major issue.

Q. An example that doesn't apply to Mrs. Godwin.

MR. GRAHAM: Objection, form.

A. And again, it -- are you asking me if it applies -- doesn't apply to Mrs. Godwin?

Q. (BY MR. DRAHOS) If -- if -- yeah, does -- does --

A. Okay.

Q. -- your example of a three not being indicative of a minor stroke because of blindness or mute, does that even apply to Mrs. Godwin?

A. Again, I think most of us don't necessarily use the terms "minor," "moderate," and "major" stroke. We all are of the understanding that as the NIH stroke score goes up, the severity of the stroke commensurately goes along with it.

Q. You're saying that there isn't categories "minor," "moderate," and "major" in the NIH stroke

Page 105

score assessment itself?

A. There may be. I'm just not specifically aware of that particular delineation.

Q. Okay. So what evidence, if any, do you have to indicate that Dr. Blignaut's testimony that Mrs. Godwin's stroke was a NIH stroke score of a three on the evening of December 18th, 2018, being incorrect?

A. Sure. I -- I can go through the -- and if you look at the records that I've provided for you on the thumb drive, I filled out an NIH stroke scale based on the available information.

If Dr. Blignaut had truly, truly done or if Dr. Radetic had truly, truly done an NIH stroke scale, don't you think that they would have documented the specific elements of that, of the NIH stroke scale? And they're clearly not all there.

Q. Okay. You did an NIH stroke score assessment and put it on this thumb drive?

A. Yes, sir.

Q. Where is that in your report?

A. That's just a part of what I did to create the report.

Q. It's not provided here today, at least it wasn't provided in advance of giving me this thumb

Page 106

drive.  This is yet another example of you coming up with new evidence --

A.  Uh-huh.

MR. GRAHAM:  Objection, form.

Q.  (BY MR. DRAHOS)  -- that you didn't put in your report.

A.  The evidence is all in the medical records.

Q.  Okay.  But your homework, so to speak, this NIH stroke score assessment that you did, you didn't print it out, you didn't put it in your report, agreed?

A.  I don't believe I put it in my report.

Q.  All right.  And so all I have in here is on a thumb drive, which I'm not able to access as I sit here?

A.  If you'd like access to it, I can give you access to it.

Q.  Well, I haven't had an opportunity to review it with my experts and go over whether or not you've even done that correctly, which is the whole reason why we have discovery procedures and rules.  So again, another issue we'll deal with with the Court.

Are you aware of the fact -- strike that.

What is it that you believe Ms. Godwin's stroke score assessment should have been on December 16, 2018?

Page 107

A.  Well, it's impossible to make an exact quantitative assessment because not all of the elements of the NIH stroke scale were -- were performed.

Of the elements that were documented in the -- in the medical record, it appears that it's at least six, based on what is there, and -- and it has to be greater based on what the physicians at the Cayman Islands noted.

Q.  All right.  How do you come up with a score of six?

A.  She received two for right upper extremity weakness, two for right lower extremity weakness, she received a one or two for -- one or -- maybe a one for aphasia, one for dysarthria; and again, there were a number of them, like limb ataxia that would more than likely escalate the -- the score --

Q.  Are you aware --

A.  -- as well.

Q.  -- of the fact that the plaintiff's own neurology expert in this case has testified that he would not have assigned anything greater than a four for Mrs. Godwin?

MR. GRAHAM:  Objection, form.

A.  I'm not aware of that.

Page 108

Q.  (BY MR. DRAHOS)  That's the first time you're hearing that here today?

A.  Yes, sir.

Q.  So you are disputing the plaintiff's own board certified vascular neurologist in this case as to his NIH stroke score assessment?

A.  I'm telling you what I -- I noted based on what was in the -- what was in the medical record; and again, there is some subjectivity in there because it's difficult to -- to discern their exam.

Q.  All right.  The whole point of the NIH stroke score assessment is to remove subjectivity, correct?

A.  Yes; and again, when you don't have -- properly perform those particular elements, it makes it very difficult to accurately make an assessment.

Q.  Do you know what Dr. Blignaut did to perform the assessments on December 16th, 2018?

A.  All I -- all I know is what he documented approximately ten hours after the -- the stroke had started.

Q.  Okay.  But as you sit here today, is there any particular aspect of the NIH stroke score assessment that Dr. Blignaut performed that you believe he did incorrectly?

A.  Well, he didn't document an NIH stroke score.

Page 109

He documented a neurologic exam.  He documented an eye exam, but he didn't specifically delineate an NIH stroke score like he had indicated in his deposition.

Q.  Okay.  But my question was a little bit different:  Aside from the documentation part, is there anything about the way he performed the test itself, the assessment itself, that you believe was incorrect that you can point to here today?

A.  He -- yes.  Well, he didn't quantify how much weakness was in the extremities.  So he just noted weakness or -- decreased power, I believe, he put.  He didn't quantify that.

Q.  You're -- you're talking about what's written.  I'm asking you about how he actually did the test itself.

So in terms of how he actually performed the assessment -- forget about what's written -- how he actually did the test, are you able to point to something and say he didn't do that right, he didn't measure this right, he didn't ask this question correctly?

MR. GRAHAM:  Objection, form.

A.  I'm not even sure that he did the test.

Q.  (BY MR. DRAHOS)  Okay.

A.  Aside from what he alleges in his deposition.

Page 110

It's just not written anywhere, so I can't tell you how he did the test.

Q.   Then you want to focus on the writing part of it.  But can't you just, then, agree, Doctor, that you don't know, you can't sit here today and point to any particular aspect of how he did the test incorrectly?

A.   Again, because I have only the medical record to -- to document or to note how somebody did the test and what they did.

And if it's not written, certainly that just leaves itself to speculation.

Q.   Aside from the fact that it's not written, anything in terms of how he physically did the test itself that you can point to here today to say this was done incorrectly?

A.   I don't know how I'm supposed to assess how he did the test if I don't know if he actually did the test, and he certainly didn't document the -- the elements of the test.

Q.   All right.  So I want you to remove that aspect of your criticism because --

A.   Sure.

Q.   -- I know you want to focus on that.  So let's just remove the fact that it's not written anywhere in the chart.

Page 111

Is there any evidence that you can point to here today to say when he did the NIH stroke score assessment, he did this part of it wrong?

MR. GRAHAM:  Objection.

A.   I -- I have no -- I have no documentation that says that he did the NIH stroke score incorrectly.

Q.   (BY MR. DRAHOS)  All right.  Thank you.

So you're not a neurologist, correct?

A.   I am not a neurologist.

Q.   You're not a vascular neurologist, either?

A.   I am not a vascular neurologist.

Q.   You're not a vascular surgeon or a neurosurgeon?

A.   No, sir.

Q.   All right.  You have no training in endovascular therapy?

A.   Not specifically doing it; but directing the therapy, yes, I do.

Q.   When you say "directing the therapy," the therapy's directed by a vascular neurologist or an interventional radiologist, correct?

A.   I will refer people and routinely coordinate care with the vascular surgeons.

Q.   All right.  So you refer to a specialist, and they make the decision as to whether or not the

Page 112

patient's going to receive that type of treatment?

A.   That is correct, yes, sir.

Q.   Okay.  And so that same would hold true for tPA; if you believe the candidate -- or the patient was a candidate for tPA, you would pass that along to a specialist for them to make the ultimate decision?

A.   That's incorrect.  I routinely make that decision, primarily.

Q.   So as it relates to the endovascular therapy, specifically mechanical thrombectomies, you don't make that decision, agreed?

A.   I do not make the decision whether the patient undergoes those interventional therapies.

Q.   But you are saying here today that you do make the decision as to whether or not to administer tPA to a patient?

A.   Quite frequently.

Q.   All right.  So would you agree with me, then, that tPA cannot be administered any greater than four and a half hours from the patient's last known well time?

A.   I -- I would disagree with that.

Q.   What is it about that that you disagree with?

A.   I'm telling you that -- that sometimes the neurologist that we -- we consult and -- will

Page 113

frequently exceed that particular window based on MRI or CT perfusion data that's obtained at the time that we see them.

Q.   You're saying that a neurologist would go beyond four and a half hours from symptom onset and administer tPA to a patient based upon MRI or CT perfusion?

A.   Absolutely.

Q.   You're totally wrong, and I know you're wrong.

MR. GRAHAM:  Objection.

Q.   (BY MR. DRAHOS)  What does the FDA say about that?

A.   Again, just because it's not FDA-approved does not mean that it is standard of care.

Q.   That's not what I asked.

What does the FDA say about the four-and-a-half-hour window?

MR. GRAHAM:  Objection, form.

A.   That from -- and actually, I -- I don't know exactly what they say -- what the FDA says about the four-and-a-half-hour window.

Q.   (BY MR. DRAHOS)  The FDA wouldn't prohibit patients from receiving tPA four and a half hours from symptom onset.  Agree or disagree?

MR. GRAHAM:  Objection, form.

Page 114

A. Again, I'm just aware of the three-hour window from the FDA.

Q. (BY MR. DRAHOS) What does the American Heart Association, American Stroke Association say about the four-and-a-half-hour window for tPA?

A. That that is the window of opportunity, the four and a half hours.

Q. In other words, they do not -- they would -- they would specifically advise against administering tPA to a patient outside of the four-and-a-half-hour window, agreed?

A. Those are recommendations from 2015, and as -- as we sit here, recommendations change based on studies that come out and other clinical data and --

Q. You're wrong again, Doctor.

MR. GRAHAM: Objection.

Q. (BY MR. DRAHOS) You know that they come out with certain classes of recommendations, agreed?

A. Yes, sir.

Q. All right. And they have specifically contraindications for certain types of treatment modalities for stroke patients, agreed?

A. The American Heart Association? Is that who we're referring to?

Q. Yes, sir.

Page 115

A. Yes, sir.

Q. All right. And you would also agree that they had guidelines in effect in 2018, correct?

A. Correct.

Q. And would you agree that the American Heart Association and American Stroke Association guidelines are the international guidelines used throughout the world?

A. I believe that they are one of the guidelines.

Q. Are they the most authoritative?

A. I -- I can't say that they are.

Q. Who is more authoritative than the American Heart Association or American Stroke Association?

A. I can tell you that there are stroke centers around the country that are more progressive than the American Heart Association and will at times deviate from those general guidelines; and that's what they are, guidelines.

Q. So what you're saying, then, is then -- well, I don't remember what you answered. Does the FDA permit administration of tPA to a patient beyond four and a half hours from symptom onset?

A. I'm not aware that they do.

Q. Okay. Which means they recommend against it?

A. No. It means that no one has submitted a study

Page 116

to go beyond that.

Q. Okay. So what does the AHA, ASA say in their 2018 guidelines as it relates to the window of opportunity for tPA treatment?

A. I believe they have a four-and-a-half-hour window for I.V. tPA.

Q. Is there any international body, peer-reviewed study, medical journal that you can point to to say that in 2018 a physician would be authorized to administer tPA to a patient beyond four and a half hours from symptom onset?

A. From last known symptom onset, I'm not aware of one.

Q. Would you agree with me that the last known well time is considered the time that the patient is at their last normal neurological baseline?

A. Forgive me. I'm just thinking through what you're -- what you said; and if you wouldn't mind repeating it one more time, please.

Q. Sure.

Would you agree with me that the last known well time is the time in which the patient is at their normal neurological baseline?

A. I -- I believe that's -- I believe that's accurate.

Page 117

Q. Okay. So when was Mrs. Godwin's last known well time, in your opinion?

A. And it was some time around -- between -- around -- somewhere between 10:00 and 11:30. I can't say with specificity because none of the parties can say with specificity.

Q. Including Mrs. Godwin?

A. Yeah, it -- it's just unclear.

Q. Including Mrs. Godwin?

A. Yes, sir.

Q. And that also includes Mr. Godwin?

A. Correct. He -- he noted that she was speaking to him normally from somewhere around, I believe, 10:30 to 11:30 when they were speaking in bed and -- when they -- when they went to bed, and then she got up around 11:30 and noted the deficit.

Q. So did Mr. Godwin report that his wife had been experiencing a headache that had not gone away since noon?

A. He had -- he had said that, yes, sir.

Q. And did Mr. Godwin also report that his wife was experiencing imbalance and wobbliness on her feet at 4 o'clock p.m.?

A. I don't recall him saying that.

Q. Are you aware as you sit here today that

Page 118

Mrs. Godwin and Mr. Godwin indicate in their depositions that she was experiencing a wobbliness on her feet at 4 o'clock p.m.?

MR. GRAHAM: Objection, form.

A. Could you show me that in the deposition transcript?

Q. (BY MR. DRAHOS) As you sit here today, are you unaware of that?

A. I understood that he said -- he or she said something about wobbliness, but that doesn't seem to be consistent with her inability to walk at 11:30.

Wobbliness aboard a cruise ship is different than weakness and inability to walk.

Q. Okay. She reported wobbliness during the muster drills. Are you familiar with what muster drills are?

A. Uh-huh, yes, sir.

Q. Okay. Those are drills that are performed before the ship even leaves the port, correct?

A. Correct.

Q. All right. And so if she was to have reported feeling wobbliness during the muster drills which are performed at 4 o'clock p.m., would that then be evidence of her being wobbly on her feet at 4 o'clock p.m.?

Page 119

A. Clearly what you're describing as wobbliness at the 4:00 p.m. muster is very different than what she was experiencing because when she experienced the difficulty walking at 11:30 p.m., she immediately noted that there was a neurologic problem, and she didn't report it as a concerning symptom earlier in the day.

Q. Is imbalance a sign of stroke?

A. It can be.

Q. So what evidence do you have to indicate that her wobbliness reported at 4 o'clock p.m. was not her last known well time?

A. I -- I know that she had gone -- gotten up and gone to the restroom, in the deposition, sometime after her husband had arrived back in the -- in their -- in their stateroom, that she had gotten up, gone to the restroom, didn't report any symptoms while she was in the stateroom.

Q. Do you agree that as more time passes from symptom onset, the less effective tPA becomes?

A. Yes, I do.

Q. And would you agree that the more time that passes from symptom onset, the more risk of complication increases with the administration of tPA?

A. Yes.

Page 120

Q. And would you agree that peer-reviewed studies indicate that the efficacy of tPA -- tPA drops by over 50 percent if being -- if given after three hours from symptom onset?

A. The efficacy of a tPA is -- the decreased risk of later administration of tPA is far better than giving nothing at all and letting the stroke evolve.

MR. DRAHOS: Move to strike as nonresponsive.

Q. (BY MR. DRAHOS) Would you agree that the peer-reviewed literature on the efficacy of tPA indicates that if it's given after 50 -- after three hours from symptom onset, its efficacy drops by 50 percent?

A. I don't know if that is a -- if that's accurate. I just don't know if that's accurate.

Q. You don't know one way or another?

A. I -- I don't know if it's 50 percent exactly.

Q. Would you agree that the safest and most efficient administration of tPA would be to give it within three hours of symptom onset?

A. I would agree that administering it early is better than giving it later.

Q. All right. But this three-hour marker in particular, does that have any clinical significance?

Page 121

A. Again, it's just -- earlier administration is generally associated with better outcomes and fewer hemorrhages.

Q. Should you administer tPA to a patient with unclear symptom onset?

A. It just depends.

Q. Well, depends on what?

A. Well, it -- it depends because you can get an MRI, an acute MRI, and see if there's a -- an area of infarct and a surrounding area of ischemia that may prove to be -- to be beneficial, and that was the whole purpose of one of the more recent studies.

Q. So in 2018 what did the FDA say about administering tPA to a patient with unclear symptom onset?

A. It -- it -- I'm not sure what they had -- had recommended at that particular time.

Q. In 2018 -- strike that.

In the 2018 guidelines by the American Heart Association, American Stroke Association, what did they say about administering tPA to a patient with unclear symptom onset?

A. I'm not sure what they specifically said.

Q. Did you even look at these guidelines before today's deposition?

Page 122

A. Which guidelines are you referring to?

Q. The AHA, ASA guidelines.

A. I know the AHA guidelines, and I -- I -- yeah.

Q. So when's the last time you looked at them?

A. Within the last few days.

Q. I noticed that you made a point to mention that Mrs. Godwin didn't have any contraindications to tPA, according to the manufacturer's pamphlet.

A. Sure.

Q. Okay. Why didn't you cite to the AHA/ASA guidelines, as well?

A. I -- because the package insert is the authority.

Q. The package insert from the manufacturer of the drug is more authoritative than the American Heart Association, American Stroke Association?

A. I knew of no contraindication that Mrs. Godwin had for administering an I.V. tPA.

Q. Did you look into whether or not the AHA/ASA had any contraindications listed here for Mrs. Godwin?

A. I looked at the AHA guidelines, and I didn't see any contraindications.

Q. Okay. So you know how to interpret these, correct?

A. If you show me what you're looking at, I'm

Page 123

happy to look at it.

Q. So there is strength of recommendations that they provide, right? It's a Class I through Class III, correct?

A. Correct.

Q. Which is the more -- what is -- which is the stronger recommendation, a Class I or Class III?

A. Class I.

Q. Actually, that's -- well, what would be the strongest recommendation, Class I or Class III?

A. So the strongest recommendation would be either a Class A or Class I recommendation.

Q. So you're saying a Class III recommendation is the weakest?

A. Again, I'm not sure if the AHA has a different -- are you okay? Forgive me.

Q. Yeah, yeah.

A. I'm -- I'm -- I didn't know if you were -- if you were feeling ill.

Q. No, no, no, just looking down.

A. Forgive me.

You know, so Class I would be the strongest recommendation.

Q. I'm going to hand you what is the 2018 AHA/ASA stroke guidelines, and I'm going to give you a chance

Page 124

to look at this.

What does it say there for Class III?

A. Class --

Q. Class III?

A. Three -- now, there's -- excuse me -- there's two --

Q. Do you see Class I?

A. There are two Class III's.

Q. Okay. Class I, II, and III.

A. There's Class I, IIa, IIb, III, and -- III.

Q. So if -- if the AHA was advising against a particular type of treatment, is there a stronger classification than a Class III? That's strongly against, correct?

A. Yeah, it's --

Q. Cause harmful -- causes harm, associated with excess morbidity and mortality, should not be performed, correct?

A. I'm just going to read it a little closer. So that we're just referring to this Class III here?

Q. Yes, sir.

A. Okay. All right. So I'm just going to read it.

Q. Okay.

A. "Suggested phrases for writing recommendations:

Page 125

Potentially harmful, causes harm, associated with excess morbidity and mortality, should not be performed/administered/other."

Q. All right. So would you agree that if the AHA/ASA was advising against a particular practice, that Class III recommendation would be the strongest one they could issue?

A. Against --

Q. Against.

A. -- against the therapy.

Q. Okay. And so would you agree that Mrs. Godwin had Marfan syndrome on December 16 of 2018?

MR. GRAHAM: Objection, form.

A. Yes, sir.

Q. (BY MR. DRAHOS) And what's Marfan syndrome?

A. Marfan syndrome is a disease that causes -- can cause weakness in the -- many of the connective tissues and has its effect many times on the consecutive tissue within the walls of blood vessels.

Q. Okay. Which would be mean that a patient who has Marfan syndrome could be at an increased risk for aortic dissection?

MR. GRAHAM: Objection, form.

A. Yes.

Q. (BY MR. DRAHOS) Okay. And as a matter of

Page 126

fact, Mrs. Godwin actually had a history of history of aortic dissection, correct?

A.  That's correct.

Q.  Okay.  And so what does the AHA/ASA say about giving tPA to a patient who has an aortic dissection?

A.  I -- I don't know of any contraindication for a prior history of an aortic dissection being a contraindication, an absolute contraindication for -- for giving I.V. tPA.

Q.  So I'm going to hand you the AHA/ASA guidelines again from 2018, and you'll see here it provides contraindications, specifically Class III.  What does it say for aortic dissection?

A.  Forgive me.  I'm trying to --

Q.  Sure.  It should be... whatever I have there.

A.  Oh, I see.

So it says, "I.V. Alteplase in AIS acute ischemic stroke, known or suspected to be associated with aortic arch dissection, is potentially harmful and should not be administered."

And we clearly do not know that her ischemic stroke was caused by or associated with an aortic dissection.  Actually, we -- we do know that it wasn't, from the imaging that was obtained in the Cayman Islands, that her prior aortic dissection was

Page 127

completely stable.

Q.  (BY MR. DRAHOS)  So are you telling the members of the jury that in 2018 a patient with an aortic dissection could be given tPA?

A.  It -- it doesn't say that.  It says if the ischemic stroke is associated with an aortic dissection, meaning if the aortic dissection is causing the stroke, then I.V. tPA would be contraindicated and harmful.

Q.  Why is tPA so potentially harmful?  Forget aortic dissection.  Just why is it potentially a harmful drug?

A.  Because it can cause bleeding.

Q.  All right.  And so I want to ask the question again because I don't know if you understood it the way I intended.

Are you saying that in December of 2018 a patient with an aortic dissection could be given tPA?

A.  That's not the clinical situation here.

Again, a patient that is actively having an aortic dissection that is associated with the stroke is a contraindication for giving I.V. tPA.

Q.  Does this say "actively"?  Does it qualify that -- the aortic dissection at all in this language?

A.  It does, and if you -- do you mind if I read it

Page 128

again to you?

Q.  No.  I mean, I can read it myself.

A.  And -- and go ahead.  I'm listening.

Q.  "I.V. Alteplase in an acute ischemic stroke, known or suspected to be associated with aortic dissection" --

A.  All right.  Stop there.  Stop there.  So the stroke known to be associated with an aortic dissection.  This is not the case here.

Q.  How do you know that?

A.  Well, we know because we have an -- the imaging from the Cayman Islands that the dissection that she had was stable from the vascular surgeon's perspective in the Cayman Islands.  She had no documentation of an aortic dissection on all of the imaging all throughout her care.

Q.  You're saying that the imaging studies done in the Cayman Islands didn't show an aortic dissection?

A.  It did not show an acute aortic --

Q.  How long -- how -- what size was that aortic dissection?

A.  I don't recall the size.

Q.  All right.  So let me go back and ask this question again:  So are you saying that in December of 2018 a patient with an aortic dissection could be

Page 129

given I.V. tPA?

MR. GRAHAM:  Objection, form.

A.  A prior history of an aortic dissection is not exclusionary for giving I.V. tPA.

Q.  (BY MR. DRAHOS)  Okay.  Are you aware of the testimony of the plaintiff's own expert in this regard?

A.  I -- I told you that I haven't seen that.

Q.  You saw -- I asked you if you saw it as it relates to whatever we were asking about before.  This is a new question now about an aortic dissection.

So you don't know what he said about that, either?

A.  No, sir.

Q.  All right.  Are you aware that he testified that if Ms. Godwin had been given I.V. tPA with her chronic aortic dissection in December of 2018, she would have been the first known case of that in the world?

MR. GRAHAM:  Objection, form.

A.  I -- I -- I don't know that.

Q.  (BY MR. DRAHOS)  Do you agree or disagree with plaintiff's own expert?

MR. GRAHAM:  Objection, form.

A.  I -- I'm simply saying that the guidelines that

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                    Pages 130..133

Page 130

you have in front of you do not suggest that a past history of an aortic dissection is a contraindication to giving I.V. tPA.

Q. (BY MR. DRAHOS) Can you tell me, in your experience as a physician, have you given I.V. tPA to patients with a diagnosed aortic dissection?

A. Certainly not an acute aortic dissection causing a stroke or acute aortic dissection in the acute scenario.

Q. Have you done it in a chronic patient?

A. I just -- I don't recall. And perhaps I have, but I just never knew because we'd never looked.

Q. Okay. So in this particular case -- strike that. Let me ask you something else first.

Are you of the opinion here today that Ms. Godwin met the clinical criteria for endovascular therapy?

A. Yes.

Q. What was the clinical criteria?

A. That she had a -- a stroke with a quantifiable deficit and met -- and that's the criteria for being considered -- for being considered for it.

Again, I don't ultimately make the -- make the call that she's got a deficit, but I.V. tPA would be the -- the first consideration.

Page 131

Q. Okay. So I don't want to waste a half hour on questions if I don't need to, so let me just make sure of something: If plaintiff's expert in this case, his vascular -- Mrs. Godwin's vascular neurologist retained in this case has testified that she didn't meet the clinical criteria for a mechanical thrombectomy, do you agree or disagree or defer to plaintiff's expert?

A. I would suggest, based on my observation, that we just don't know because my feeling is -- and we frequently will see this -- that there is a proximal occlusion that can sometimes break apart and spread a clot to distal -- distal territories within the brain.

The unfortunate thing that we don't have is we don't have a vascular study at the time that she started experiencing her symptoms.

Q. Does the patient who has a clot in a small vessel qualify for a mechanical thrombectomy?

A. They may qualify for interarterial tPA but not a stenting.

Q. All right. So we have an MRI on Mrs. Godwin's brain, correct?

A. Yes.

Q. And it was an occlusion in a small vessel, agreed?

Page 132

A. That -- that was what we knew 32 hours after --

Q. Right.

A. -- her symptoms had -- had developed.

Q. Okay. So would you agree as you sit here today that she would not have been a candidate for endovascular therapy based upon the fact that her occlusion occurred in a small vessel?

A. I just can't say that because we don't know if that's the only place where her -- where her clot started.

Q. Do you have evidence of it being in a large vessel at any point in time?

A. I don't -- I don't have specific evidence, but I.V. anecdotal evidence that we see clots frequently that start out in a proximal location and end up in a distal location.

Q. Yeah, I don't care about anecdotal evidence.

In Mrs. Godwin's particular case, do you have any evidence that she had a clot in a large vessel at any point in time?

A. I don't.

Q. All right. So as you sit here today, do you have any evidence that you can point to to say that she would have been a candidate for a mechanical thrombectomy?

Page 133

A. A mechanical thrombectomy, not with interarterial tPA perhaps.

Q. Okay. So as it relates to interarterial tPA, let's sort round third base and head home here, what you're saying is even though she had unclear symptom onset with a history of aortic dissection, that she still -- wait. Strike that.

Can you state within a reasonable degree of medical probability that Mrs. Godwin would have received tPA treatment on December 16, 2018?

A. That -- that is my testimony, that had she made it to one of the local comprehensive stroke centers, that she would have.

Q. By what time?

A. If she had made it there by -- and forgive me. I'm doing the math in my head. So by approximately 4:00 a.m.

Q. If she made it to the shoreside facility by 4:00 a.m.?

A. No, if she had received treatment by 4:00 a.m.

Q. What time would she have needed to report to a shoreside facility?

A. By approximately 3:15-ish a.m.

Q. So you're stating here within a reasonable degree of medical probability that she would have

Page 134

received it, not whether or not she would have been a candidate, she would have received it had she arrived by 3:15 a.m.?

A.  Yes, if she has no contraindications to receive it.

Q.  Did you say if she has no contraindications?

A.  No, no, that -- I didn't note any contraindications for her receiving it.  So I believe that she would have received it.

Q.  All right.  So what you're stating then is despite the fact that she had an unclear symptom onset and she had a history of aortic dissection, if she had been delivered to a shoreside center by 3:15 a.m., she would have received tPA treatment?

A.  That is my opinion, yes, sir.

Q.  All right.  No further questions, Doctor.

EXAMINATION

BY MR. GRAHAM:

Q.  I'm going to have some follow-up.  Would you like to take a short break beforehand, or would you like to keep going?

A.  No, we can go.

Q.  Sort of to bring us down from the stratosphere here a little bit, what is a flight surgeon?

A.  Sure.  A flight surgeon is a medical physician

Page 135

who is trained in the aeromedical environment.  We are trained to understand how airplanes and helicopters work.  We're trained to understand their mission, what they can do.  We're trained on taking care of pilots and the crew that may experience problems up at altitude or reasons why they may or may not need to go on any mission, things that don't -- reasons why you should keep somebody on the ground and not let them fly.

Q.  In the context of a search and rescue mission which would have been potentially undertaken for someone like Ms. Godwin, what would a flight surgeon's role be?

MR. DRAHOS:  Object to the form.

A.  A flight surgeon's role would be to provide medical oversight, to provide a medical opinion whether the particular mission would -- whether -- whether a -- the mission could be achieved successfully or where the -- whether there is resources aboard the ship that could be taken care of -- take care of the patient or whether a patient may need to be Medevac'd off a ship.

They look at the particular clinical situation and decide, based on their medical opinion, whether there are resources that can be used that are

Page 136

off the ship that aren't available on the ship.

Q.  (BY MR. GRAHAM)  What -- particularly, what did you have to do to become a flight surgeon?

A.  So we had to go through four years of medical school and earn our medical degree.  We had to at least do one year of postgraduate training, which is the internship that I did at Portsmouth Naval Hospital, and then we went down to Pensacola, Florida, for approximately a year and were immersed in learning the -- how airplanes and helicopters are put together, how they work, in addition to, excuse me, all of the medical information that we needed to accumulate to understand what goes on at altitude and on the ground, when to keep people on the ground.

Q.  And you accomplished that, correct?

A.  I did.

Q.  So you were a flight surgeon?

A.  Yes, sir.

MR. DRAHOS:  Object to the form.

Q.  (BY MR. GRAHAM)  Is there any functional difference between what a flight surgeon does for the U.S. Coast Guard as opposed to what a flight surgeon does for the U.S. Navy in the context of a search and rescue mission?

MR. DRAHOS:  Object to form.

Page 137

A.  No, sir.

Q.  (BY MR. GRAHAM)  So walk me through what would happen if a flight surgeon were contacted about Ms. Godwin.

MR. DRAHOS:  Object to the form.

A.  Yeah.

So if -- and this happened on our base, the -- the -- somebody would call the -- the base, and the base would call me and say, Hey, we've got somebody out at sea, we need some medical support.  And within, you know, five, ten minutes, I could be in the Coast Guard hangar and be available for -- for assistance if they needed to bounce the medical situation off me to see if I really needed to go.

And perhaps if -- if I needed to personally be involved in the mission, I -- I would -- you know, I could make that decision at that time.

Other things that we would do would be to determine the most appropriate facility to take a patient to based on their particular -- particular injuries or illness.

Q.  (BY MR. GRAHAM)  So you worked fairly closely with the United States Coast Guard when you were a flight surgeon?

MR. DRAHOS:  Object to the form.

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**          Pages 138..141

Page 138

A. For all of my years there.

Q. (BY MR. GRAHAM) And describe for me, if you would, please, the interface that you had with the U.S. Coast Guard.

A. Sure.

So as we talked about earlier, we coordinated care with -- with them to arrange medevac transport to local hospitals during our air show, and I was the -- one of two flight surgeons for the whole base. So they -- I took care of them if they had any medical issues. I took care of their personnel from -- everybody from the least senior person to the most senior person.

And when they specifically needed search and rescue support, they reached out to me, and I similarly reached out to them because I appreciated their mission and enjoyed flying with them because I knew I wanted to go into emergency medicine and was -- the mission was very consistent with what I wanted to do as an emergency physician.

Q. In the context of search and rescue, would you ever have occasion to just consult or get on the phone but not actually go on the mission?

A. Sure.

They -- they could consult me if -- if they

Page 139

wanted to.

Q. And what would that process entail?

MR. DRAHOS: Object to the form.

A. They -- they would either just call me, if I happened to be in the clinic; if I happened to be on call, it was done through a paging. We -- we had pagers at that time, so they would page me. And I'd just call them on my cell phone and be -- we had a short period of time which -- you know, we had to call within five to ten minutes of getting -- getting a call if we were on call.

Q. (BY MR. GRAHAM) The opinions you've rendered today in your deposition and in your report, those are all to a reasonable degree of medical certainty from the standpoint of a flight surgeon, correct?

A. Yes.

Q. Okay. What do you believe -- after reading through the report of Dr. Harman, what do you either believe to be wrong or take issue with that Dr. Harman opined on in his report?

MR. DRAHOS: Form.

A. That Dr. Harman was -- several things: First, Dr. Harman's report is predicated on the theory that the patient was having an acute ischemic stroke at the time that the medical staff was called.

Page 140

And we don't know that the patient was having an acute ischemic stroke. The patient could have been bleeding in her head from a hemorrhagic stroke. The patient could have had a tumor, patient could have had meningitis, encephalitis, an aortic dissection, a carotid dissection causing the -- causing what you had in front of you.

And to presume that there was a three-hour time frame and it -- that had to be met is just really a -- a hypothetical situation that is just wrong because the patient could have been bleeding in her head and we'd never know the difference and it could have been more disastrous.

So the issue is first that a -- an accurate diagnosis needed to be made, and an accurate diagnosis could not be made aboard the Brilliance of the Seas.

A -- a CAT scan of the patient's head needed to be done to discern what was there on -- on the CAT scan. If she was bleeding in her head, then she wouldn't be a candidate for tPA.

And then secondly, aside from the differential diagnosis that wasn't considered, is that Dr. Harman is relying on this 2010 document that is well before modern stroke care. And specifically, in 2008 the standard of care was extended to a 4.5-hour

Page 141

window to tPA -- to be able to use I.V. tPA, and he is relying on a Coast Guard memorandum that three hours is the time -- time frame.

And the Coast Guard does not set standards of care for -- for medicine, and that's why medical -- medical trials move a lot faster than Coast Guard memorandum that are used.

And I think most members of the jury would agree that relying on a 2010 memorandum to treat somebody in almost 2019 is -- is inappropriate.

MR. DRAHOS: Move to strike.

Q. (BY MR. GRAHAM) And so based upon your background, training, and experience as a flight surgeon, do you believe that document with the three-hour time limit would have controlled in Ms. Godwin's case and meant that she could not be evacuated for care?

MR. DRAHOS: Object to form.

A. Absolutely not. The -- it would not have controlled.

Q. (BY MR. GRAHAM) Okay. Had you been contacted as a flight surgeon in response to Ms. Godwin's incident on board the Brilliance of the Seas, what would you have determined or done?

A. I -- I would have asked what the NIH stroke

Page 142

scale was and what their exam was and when it started and recommended to immediately medevac the patient off the ship.

Q. And I -- okay. And I want you to assume for me hypothetically that that NIH score that's not in the medical records was in there as a III.

A. Sure.

Q. Would you still have gone forward with the decision to evacuate Ms. Godwin?

A. Mrs. Godwin had had a measurable deficit at that time. So even if it was a III -- and I've done this frequently in my medical career, tPA'd folks -- patients with lower NIH stroke scales and have done it alongside numerous neurologists, as well.

Q. So fair to say from a flight surgical medical standpoint, it would have been a green light to evacuate Ms. Godwin off that ship?

MR. DRAHOS: Object to the form.

A. Absolutely.

Q. (BY MR. GRAHAM) Detail for me why.

MR. DRAHOS: Object to the form.

A. Again, we -- we didn't know what was going on with Ms. Godwin. She had right-sided weakness, she had -- was unable to speak, and she had symptoms that were quite suggestive of a stroke; but again, we were

Page 143

unclear what exactly was causing her symptoms and so -- again, she could have been bleeding in her head, she could have had a dissection in her arteries, she could have had a tumor that was causing these symptoms, she could have been bleeding in her head; and so not only was it imperative that she get off the ship to get timely evaluation for these other issues, she was also well within the window to get therapeutic treatment if, in fact, she had an ischemic stroke. And that's what she had -- actually had.

Q. (BY MR. GRAHAM) And had you been consulted as a flight surgeon, what facility would you have recommended or what type of facility would you have recommended that Ms. Godwin be air evacuated to?

MR. DRAHOS: Object to the form.

A. Certainly the highest level of stroke center would be a comprehensive stroke center that has a 24-hour, on-call stroke team and has the resources, MRI, CTs, to -- and -- and endovascular treatments to take care of the patient if for some reason there happened to be a contraindication for I.V. tPA.

And so in the course of where the Brilliance of the Seas was, it was approximately parallel to Fort Myers, Florida, and there -- the Lee Health System has three stroke centers there, one of

Page 144

them being a comprehensive stroke center capable of 24-hour-a-day endovascular care, stroke care, and they have a stroke team in-house 24 hours a day, as does the Tampa General Hospital where the Brilliance of the Seas originated.

Q. (BY MR. GRAHAM) And --

A. Either of those.

Q. Understood.

And to arrive at your opinions, what is the information or facts that you're analyzing to arrive at your opinions?

MR. DRAHOS: Object to the form.

A. Sure.

So based on my experience, knowledge, and training, education as an emergency physician, having treated hundreds and hundreds of patients with I.V. tPA and/or endovascular therapy or having guided that therapy, that is the -- the basis of my opinions.

Q. (BY MR. GRAHAM) And as well as the -- I'm assuming the case materials, Ms. Godwin's medical records?

A. Sure.

The -- what I rely on in her medical records, the medical studies that I -- I noted in my -- in my record are all supportive of my opinions.

Page 145

Q. And I know you did some research and you found or -- or read a few articles indicating that stroke patients beyond that three-hour time frame listed in the Coast Guard document were, in fact, air evacuated with some regularity?

MR. DRAHOS: Object to the form.

A. Absolutely. And the -- the Internet is littered with plenty of stroke patients who were beyond the three-hour window and being taken for further evaluation of their stroke symptoms.

Q. (BY MR. GRAHAM) Is there -- I want to just give you an opportunity... anything else you'd like to add or change or follow up with that you haven't had a chance to testify with -- about today?

MR. DRAHOS: Object to form.

A. I think it's critical to understand that the 2010 document that Dr. Harman is relying on is just completely misleading as to what can and often does happen aboard these ships, that people do get taken off the ships with regularity, taken to stroke centers for further evaluation.

The doctors aboard were woefully unprepared to address Mrs. Godwin's symptoms. Dr. Radetic in particular endorsed that he had not seen a stroke patient in the 25 years before joining -- before

**Page 146**

joining the Royal Caribbean line and that he was a -- a hand surgeon by -- by training, and I -- I find it just unconscionable that Royal Caribbean would hire a hand surgeon to take care of patients aboard their ship where the average age is greater than 50 years old and not understand that a hand surgeon is going to be unprepared to take care of the cardiovascular issues and stroke issues that frequently will accompany that demographic.

Q. (BY MR. GRAHAM) That -- that Coast Guard, we'll call it stroke document or the document that references the three-hour window, it's a 2010 document. Ms. Godwin's incident was in 2018, correct?

A. That is correct.

MR. DRAHOS: Object to form.

A. Almost 2019.

Q. (BY MR. GRAHAM) A lot about medicine can change in the span of eight years, right?

A. It changes frequently throughout the year.

Q. And do you know what the time frame was for a mechanical thrombectomy as of 2018 for a stroke patient?

A. Yes. The window of opportunity was up to 24 hours.

Q. So if you were to follow that guideline in

**Page 147**

2018, no stroke patient that might be a candidate for a mechanical thrombectomy outside of three hours would get treatment, right?

MR. DRAHOS: Object to the form.

A. That's right.

MR. DRAHOS: He's testifying.

Q. (BY MR. GRAHAM) Does that seem to be a reasonable medical opinion for the Coast Guard to make?

MR. DRAHOS: Object to form.

A. Absolutely not relying on a three-hour time window for -- as a blanket statement for stroke treatment or stroke evaluation is just erroneous.

Q. (BY MR. GRAHAM) Does a flight surgeon, when contacted or consulted, search for every possible reason to deny a patient care? Is that their job?

MR. DRAHOS: Object to the form.

A. Absolutely not. No, actually it's quite the opposite, is they are looking for ways that they can assist, just as we do in our daily jobs as physicians, to help the patient get the care that they need in a timely fashion at the specific facility that has the resources that are needed.

MR. GRAHAM: Thank you. No further questions for me.

**Page 148**

MR. DRAHOS: Read or waive, Doctor?

THE WITNESS: I -- I -- I'd like to read the document, please.

MR. DRAHOS: By the way, did I attach his report as Exhibit D? I'm going to go ahead and attach his report as Exhibit D to the deposition.

(Whereupon Exhibit Number D was marked for identification.)

MR. GRAHAM: That's the report?

MR. DRAHOS: Yeah, you can confirm.

MR. GRAHAM: No, mine looks a lot bigger. Probably has other stuff in it.

MR. DRAHOS: I'm going to mark the thumb drive as Exhibit E, but I'm going to retain Exhibit E.

So my office will probably just send you a link with everything that's contained in this so we know exactly what he brought today. Okay.

(Whereupon Exhibit Number E was marked for identification but retained by counsel.)

MR. GRAHAM: And, Mike, if you don't mind, copy us on it.

(Deposition concluded.)

**Page 149**

CHANGES AND SIGNATURE

WITNESS NAME: KENNETH ALAN TOTZ, D.O.    DATE: 5/17/21

PAGE          LINE          CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**MARY GODWIN vs ROYAL CARIBBEAN CRUISE LTD.**
**Kenneth Alan Totz, D.O. on 05/17/2021**                     **Pages 150..152**

**Page 150**

I, KENNETH ALAN TOTZ, D.O., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
KENNETH ALAN TOTZ, D.O.

THE STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared KENNETH ALAN TOTZ, D.O., known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

**Page 151**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MARY GODWIN,                )
                            )
    Plaintiff,              )
                            )
VS.                         ) CASE NO.:
                            ) 1:19-cv-24672-JG
ROYAL CARIBBEAN CRUISE      )
LTD., a Liberian            )
Corporation,                )
                            )
    Defendant.              )

REPORTER'S CERTIFICATION
DEPOSITION OF KENNETH ALAN TOTZ, D.O.
MAY 17, 2021

I, Annette Peltier, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, KENNETH ALAN TOTZ, D.O., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to Mr. Michael Drahos, Custodial Attorney.

That a copy of this certificate was served on all parties shown herein on _____.

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

XXX was requested by the deponent or a party before the completion of the deposition and that signature is

**Page 152**

to be returned within 30 days from the date of receipt of the transcript.  If returned, the attached changes and signature page contains any changes and the reasons therefore.

____ was not requested by the deponent or party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this testimony was taken.  Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Certified to by me this 25th day of May, 2021.

_____
Annette Peltier, Texas CSR 3253
Expiration Date:  10/31/21
Huseby, Inc.
1230 West Morehead Street, Suite 408
Charlotte, NC 28208
800.333.2082